**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN RYAN MILLER**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 22-3329-KSM** |
| **THOMAS GOGGIN, et al.,** | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.**                                                                                  **May 5, 2023**

*Pro se* Plaintiff John Ryan Miller brings this action against dozens of school district officials and law enforcement officers from various localities across southeastern Pennsylvania. (*See* Doc. No. 1.)  Plaintiff contends that the Octorara School District's enforcement of its public participation policy, Policy 903, is unconstitutional, and that members of the school board conspired with local public servants to prevent him from speaking at or attending school board meetings.  (*Id.* at 66–93.)  Among the named defendants are Defendants Lisa Bowman, Brian Fox, Sam Ganow, Matt Hurley, Charlie Koennecker, Brian Norris, Jared Zimmerman, Lisa Yelovich, John Propper, Michelle Orner, Jill Hardy, and Jeff Curtis (the "Octorara Defendants"); Defendants Thomas Goggin, John O'Donnell, David Sassa, and Robert Dougherty (the "Detective Defendants"); and Defendant Deborah Ryan (collectively, "Defendants").[1]  Presently

---

[1] Defendants Lisa Bowman, Brian Fox, Sam Ganow, Matt Hurley, Charlie Koennecker, Brian Norris, Jared Zimmerman, Lisa Yelovich are Octorara School Board Members.  Defendant John Propper is Principal of Octorara Junior-Senior High School.  Defendant Michelle Orner is Superintendent of Octorara School District.  Defendant Jill Hardy is Secretary to the Octorara School Board and Octorara School District Superintendent.  Defendant Jeff Curtis is Business Manager of Octorara School District.  Defendants Thomas Goggin, John O'Donnell, David Sassa, and Robert Dougherty are detectives within

before the Court is the Octorara Defendants' Motion to Dismiss (Doc. Nos. 215, 253), the

Detective Defendants' Motion to Dismiss (Doc. No. 204), and Defendant Ryan's Motion to

Dismiss (Doc. No. 177), by which they seek dismissal of Plaintiff's Complaint in its entirety.

Plaintiff opposes the motions.  (Doc. Nos. 229, 251, 271, 275.)[2]  For the following reasons, the

motions are granted in part and denied in part.

## I.   BACKGROUND

At this stage, the Court takes as true the facts alleged in Plaintiff's Complaint.[3]

### A.   The January 24 Meeting

Plaintiff alleges that he first attended a school board meeting on January 24, 2022 after he

had been "engaged by several parents of students enrolled in Octorara School District" to attend

---

the Chester County Detectives Office.  Defendant Deborah Ryan serves as the Chester County District
Attorney; her name is incorrectly spelled as "Debra" in the Complaint.  (*See* Doc. No. 1 at 1, 3.)

[2] Plaintiff also filed hundreds of pages of "exhibits" on the docket, which he claims support his opposition
to Defendants' motions.  "As a general matter, a district court ruling on a motion to dismiss may not
consider matters extraneous to the pleadings."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410,
1426 (3d Cir. 1997).  An exception to the general rule is that "a document integral to or explicitly relied
upon in the complaint may be considered without converting the motion to dismiss into one for summary
judgment."  *Peele v. Delaney*, No. CV 12-4877, 2017 WL 467347, at *4 n.4 (E.D. Pa. Feb. 3, 2017).  But
the Court has had some difficulty identifying discrete documents that may support Plaintiff's claims, and
Plaintiff has failed to direct the Court's attention to any specific evidence integral to its particularized
consideration of his Complaint.  Thus, the Court does not rely on this voluminous record in the resolution
of these motions.

[3] The Court notes that some of Plaintiff's responses to the various motions to dismiss mention facts and
assert claims that were not pleaded in the original Complaint.  But the proper mechanism for adding
allegations or causes of action to a pleading is an amendment, so the Court cannot consider these extra
facts and claims here.  *See* Fed. R. Civ. P. 15.  To that end, we acknowledge that Plaintiff specifically
refers to events that occurred *after* his Complaint was filed, primarily arising out of Plaintiff's attempt to
attend another school board meeting in September 2022.  These facts were mentioned in an "addendum"
to his Complaint filed on December 5, 2022.  (*See* Doc. No. 191.)  This "addendum" is best understood as
a supplemental pleading to Plaintiff's Complaint, as it details events that occurred after his initial filing on
August 18, 2022.  Under Rule 15(d), "on motion and reasonable notice," the court may permit a party to
serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the
date of the pleading to be supplemented."  But Plaintiff did not seek the Court's leave to file this
addendum.  Thus, it is improper, and the Court only considers the factual allegations and legal claims in
the Complaint.

the meeting on their behalf and speak during the public comment period.  (Doc. No. 1 at ¶¶ 38, 72.)  According to Plaintiff, "the engagement was related to parental concerns, regarding actions/consequences, resulting from policy enforcement, mandates, guidelines, and other harms which children were experiencing within Octorara School District through their administration and actions through elected School Board members."  (*Id.* at ¶ 38.)  Before Plaintiff spoke at the meeting, Octorara School Board President Brian Fox asked Plaintiff to provide his name and residing municipality in compliance with "District Policy 903."  (*Id.* at ¶ 74.)

Policy 903 provides "an opportunity at each open meeting of the Board for residents and taxpayers to comment on matters of concern, official action or deliberation which are or may be before the Board prior to official action by the Board."  Octorara Area School District Website, *School Board – Policies*, "Policy 903 – Public Participation in Board Meetings," https://go.boarddocs.com/pa/octo/Board.nsf/Public# (last visited March 20, 2023) ("Policy 903").[4]  According to Policy 903, there are two opportunities for public comment during board meetings.  *See id.*  The first is "usually toward the start of the meeting and is intended for public comment or questions related to posted agenda items."  *Id.*  The second is "usually toward the end of the meeting and is intended for public comment or questions on any topic related to district business."  *Id.*  Policy 903 states that "the Board will not respond to comments or questions" during these public comment periods, and that the public comment periods are not "designed to be an open discussion with the Board."  *Id.*

Policy 903 also sets out the following guidelines for public comment:

> The Board requires that public participants be residents or taxpayers of this district, a parent/guardian of any district student, any district employee, or any district student.  Participants must be recognized

---

[4] Plaintiff did not attach a copy of "District Policy 903" to the Complaint, but the Court previously took judicial notice of the policy (Doc. No. 254), which can be found in the Octorara School Board Policy Manual on the Octorara School District's website.

by the presiding officer and must preface their comments by an announcement of their name and municipality.  Each statement made by a participant shall be limited to three (3) minutes duration for a total of thirty (30) minutes per public comment opportunity.  All statements shall be directed to the presiding officer; no participant may address or question Board directors individually.

The presiding officer may:

1.   Interrupt or terminate a participant's statement when the statement is too lengthy, obscene, or irrelevant.
2.   Request any individual to leave the meeting when that person does not observe reasonable decorum.
3.   Request the assistance of law enforcement officers to remove a disorderly person when the person's conduct interferes with the orderly progress of the meeting.
4.   Call a recess or adjourn to another time when the lack of public decorum interferes with the orderly conduct of the meeting.
5.   Waive these rules with the approval of the Board.

*Id.*

When President Fox asked Plaintiff to provide his name and municipality before proceeding with his public comment at the January 24 meeting, Plaintiff argued that he believed he had "no duty nor obligation to provide the requested information" under the United States Constitution.  (Doc. No. 1 at ¶ 75.)  But after some "back-and-forth" with President Fox, he nevertheless provided his name and the fact that he is a Chester County resident in accordance with Policy 903.[5]  (*Id.* at ¶¶ 75–90.)  Plaintiff proceeded to make his public comment, in which he "redress[ed] the board in their collective violation of their sworn duties and oath to the constitution."  (*Id.* at ¶ 80.)

---

[5] Plaintiff indicated that he "eventually" stated "a municipality within the jurisdiction of the Octorara School District," but fails to specify which municipality in his Complaint.  (Doc. No. 1 at ¶ 79.)  The Court takes judicial notice of the fact that the boundaries of Octorara School District encompass parts of southwestern Chester County and southeastern Lancaster County.  *See* Octorara School District Website, *District Information*, "History," https://www.octorara.k12.pa.us/Page/85 (last visited May 4, 2023).

After that meeting, Plaintiff claims that he "obtained a host of public records documents, sent additional notice of warning,[6] attempting to reason and correct the mis-statements and mis-representations regarding policy and constitutional rights." (*Id.* at ¶ 98.)  Plaintiff also "sent communication to the Chester County District Attorney" regarding "the unlawful acts perpetrated by the board members." (*Id.* at ¶ 99.)  Plaintiff "attempted to engage the County District Attorney to investigate multiple school districts who allegedly violate citizens' rights through the enforcement of School Board Policy 903." (*Id.* at ¶ 33.)  Plaintiff requested that District Attorney Deborah Ryan "convene a grand jury to hear and review testimony from injured parties, to determine if an investigation was warranted." (*Id.* at ¶ 34.)  He reports that District Attorney Ryan "ignored and subsequently denied" this request, and that "the issues presented to the DA were re-directed to Chester County Detectives." (*Id.*)

According to Plaintiff, "[t]he District Attorney forwarded the communications to [the] Chester County Detectives Unit, [who] were allegedly directed to open up a case related to Plaintiff's concerns." (*Id.* at ¶ 100.)  Plaintiff emailed with Chester County Detective John O'Donnell, explaining that he believed the Octorara School Board had violated his rights by requiring compliance with Rule 903. (*Id.* at ¶ 101.)  In his correspondence with Chester County law enforcement officials, he explained that he would "seek redress/remedy if Plaintiff's rights were violated further." (*Id.* at ¶ 104.)  To that end, he provided law enforcement with "role-play scenarios, which created a base of expectations and how the Plaintiff would conduct himself if/when Plaintiff could encounter law enforcement" and described "actions [Plaintiff would take] if Plaintiff were to encounter public servants who might violate their oath to their position." (*Id.*

---

[6] Plaintiff notes throughout his Complaint that he sent several "advance notices" to school board officials and to law enforcement, from as early as October 2021, regarding his intent to speak at school board meetings and his belief that public servants were acting in an unconstitutional manner. (*Id.* at ¶¶ 61, 71, 82–87, 92, 93, 95, 98, 105, 114, 116, 206, 368.)

at ¶¶ 102–08.)  The Chester County District Attorney's Office, in conjunction with the Chester County Police Department, subsequently circulated Plaintiff's correspondence to other local police departments via email, "with the implication that the Plaintiff's exercise of his constitutional rights is suspicious and allegedly suggest criminal behavior in nature."  (*Id.* at ¶ 109.)

### B.    The February 14 Meeting

Plaintiff attempted to attend another Octorara School Board meeting on February 14, 2022.  (*Id.* at ¶ 120.)  As he pulled into the school parking lot, Plaintiff saw Pennsylvania State Troopers and to avoid any interactions with law enforcement, he "decided to relocate and park his vehicle at an adjacent parking lot."  (*Id.* at ¶ 122.)  Plaintiff then walked to the school and began a live video recording as he approached the school entrance.  (*Id.* at ¶¶ 121–23.)  Plaintiff encountered the Octorara Junior-Senior High School Principal, John Propper, standing outside the school, who informed him that the meeting had been cancelled.[7]  (*Id.* at ¶ 126.) After Plaintiff drove away, he claims that he was followed and eventually pulled over by Pennsylvania State Trooper Kevin Kochka.[8]  (*Id.* at ¶¶ 131–34.)  Trooper Kochka told Plaintiff he was pulled over for "investigative purposes" because Plaintiff was "driving a suspicious vehicle," and ordered Plaintiff to exit his vehicle.  (*Id.* at ¶¶ 138–42.)  Trooper Kochka informed Plaintiff that he was not free to leave.  (*Id.* at ¶ 142.)  Additional unidentified police officers then

---

[7] Plaintiff alleges that the school board "provided no information as to the reasoning for the meeting cancellation."  (*Id.* at ¶ 126.)  Plaintiff does not believe the cancellation was weather-related because "no snow was on the ground," and claims that he later discovered "through public records requests" that some of the defendants in this suit conspired to cancel the meeting because of "Plaintiff wanting to speak at the board meeting."  (*Id.* at ¶¶ 126–28.)

[8] Trooper Kochka was previously named as a defendant in this action.  (*See id.* at 1.)  On December 6, 2022, in conjunction with other named defendants, Trooper Kochka filed a motion to dismiss Plaintiff's claims against him.  (Doc. No. 206.)  The motion to dismiss was uncontested and the Court granted it on May 4, 2023.  (*See* Doc. Nos. 283, 284.)

arrived on the scene.  (*Id.* at ¶ 148.)  Plaintiff refused to produce his driver's license for the

officers.  (*Id.* at ¶ 150.)  Approximately 25 minutes after Plaintiff was pulled over, Plaintiff was

released without a citation.  (*Id.* at ¶ 153.)

### C.     The March 21 Meeting

Plaintiff attended the March 21, 2022 school board meeting and sought to speak during

the public comment period.[9]  (*Id.* at ¶ 159.)  But President Brian Fox refused to allow Plaintiff to

speak without stating his name and residing municipality, as required by Policy 903.  (*Id.* at ¶

165.)  Plaintiff declined to comply with that requirement, and as he was leaving the meeting,

announced that he was "going to call the police and request the police to affect [sic] a private

person arrest of the board members."  (*Id.* at ¶¶ 166–67.)  Meanwhile, Trooper Kochka and

another unidentified police officer entered the room.  (*Id.* at ¶ 168.)  Plaintiff demanded that the

officers arrest the school board members; they declined.  (*Id.* at ¶¶ 169–70.)  The officers asked

Plaintiff to leave and stated that if he refused to do so, he would be charged with trespass.  (*Id.* at

¶¶ 175, 177–78.)  Upon removing Plaintiff from the meeting, Trooper Kochka informed Plaintiff

that he was no longer allowed on Octorara Area School District property, and that Plaintiff

would be arrested if he returned.  (*Id.* at ¶ 189.)

### D.     Plaintiff's Communications with the School Board and Law Enforcement

On March 23, 2022, Plaintiff received a formal letter from Octorara Area School District

Superintendent Michelle Orner confirming that Plaintiff was banned from school property.  (*Id.*

---

[9] The Court previously took judicial notice of the Octorara School Board meeting minutes from March 21, 2022 (Doc. No. 254), which indicate that Plaintiff is referring to events that occurred on this date.  *See* Octorara Area School District Website, *School Board – Minutes*, "Recent Board Minutes, 2022-03-21 Regular" https://pa50000610.schoolwires.net/cms/lib/PA50000610/Centricity/Domain/48/Mar%2021- 22%20Reg%20Meeting%20Minutes.docx.pdf (last visited March 20, 2023) ("A citizen who refused to introduce himself or give his municipality per Board Policy, was escorted from the Board Room by Pennsylvania State Police.").

at ¶ 194.)  Plaintiff responded on March 30, 2022, with a "Letter of Intent to Sue."  (*Id.* at ¶ 212.)
He received a response from Octorara School District Solicitor Benjamin Pratt, Esquire on April
13, 2022.  (*Id.* at ¶ 215.)  Because Plaintiff contends his lawsuit "is a private legal matter with
private individuals," he did not respond to Mr. Pratt as he believes Mr. Pratt has "no standing or
authority to represent school board members in a private litigation matter."  (*Id.* at ¶ 216.)

In an apparent effort to come to a resolution regarding the enforcement of Policy 903,
Plaintiff emailed President Fox on June 3, 2022.  (*Id.* at ¶ 284.)  President Fox maintained that
the board had authority to enforce the policy.  (*Id.* at ¶ 285.)  Plaintiff again communicated with
President Fox and the Octorara School Board on June 9 and June 13, 2022 regarding his
concerns about the policy, but those communications went unanswered by the board.  (*Id.* at
¶¶ 287–88.)  Plaintiff asserts that he attempted to find the agenda and minutes from the June 20,
2022 school board meeting, but that Octorara School District had not posted that information on
its website.  (*Id.* at ¶¶ 290–98.)  Plaintiff also complains that Octorara School District's social
media accounts, such as Facebook, YouTube, and Zoom "have been configured by public
officials[] to preclude the ability for the general public to comment."  (*Id.* at ¶¶ 301–07.)  Finally,
Plaintiff claims that the school board meeting minutes from several school board meetings in
early 2022 are incomplete.  (*Id.* at ¶¶ 308–11.)

Using the process established by Pennsylvania's Right-to-Know Law, 65 PA. CON. STAT.
§ 67.101, Plaintiff also requested any communications between "Chester County Detectives,
local law enforcement, Pennsylvania State Troopers, [and] School Board officials," regarding
Plaintiff's interactions or grievances with the Octorara School Board.  (*Id.* at ¶¶ 119, 283, 290.)
According to Plaintiff, these requests "produced no documents."  (*Id.* at ¶ 119.)  Plaintiff asserts
that these documents were not produced because they were destroyed.  (*Id.* at ¶¶ 402–04.)

### E.      Procedural History

Plaintiff filed this lawsuit on August 18, 2022.  (*Id.*)  He asserts ten counts[10] against 84 defendants, arising out of alleged violations of the First Amendment, Fourteenth Amendment, two federal criminal statutes, *see* 18 U.S.C. §§ 242, 2071, and the Pennsylvania Sunshine Act, *see* 65 PA. CON. STAT. §§ 701–716.[11]  (*Id.* at ¶¶ 330–412.)  Plaintiff attached a "Defendant Matrix" at the end of his Complaint, which identifies the specific claims brought against each defendant.  (*Id.* at 100–01.)  He brings all ten counts against the Octorara Defendants and Counts I–IX against the Detective Defendants and Defendant Ryan.  (*Id.*)  Defendant Ryan filed a Motion to Dismiss on November 28, 2022 (Doc. No. 177); the Detective Defendants filed a Motion to Dismiss on December 6, 2022 (Doc. No. 204); and the Octorara Defendants filed a Motion to Dismiss on December 29, 2022 (Doc. No. 215.)  By way of these motions, Defendants seek dismissal of Plaintiff's Complaint in its entirety.

## II.    LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), the court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

---

[10] There appears to be a typographical error in Plaintiff's "Defendant Matrix"; the Matrix lists a "Count XI," but there is no Count XI in the body of the Complaint.  (Doc. No. 1 at 100.)

[11] Plaintiff's Complaint is rife with mention of the Fourth Amendment, mainly reiterating his belief that Policy 903 requires citizens to "surrender their 4th amendment right in order to exercise their 1st amendment [right]."  (*See* Doc. No. 1 at ¶ 63.)  Plaintiff does not elaborate on what he means by this statement, nor does he bring any cause of action under the Fourth Amendment.  Thus, the Court cannot discern the basis for this constitutional claim, if in fact such a claim exists.

possibility that a defendant has acted unlawfully." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When reviewing a motion to dismiss, courts "must accept the allegations in the complaint as true, but are not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted).

"While a plaintiff's factual allegations must be enough to raise a right to relief above a speculative level, complaints filed *pro se* must be liberally construed." *Muchler v. Greenwald*, 624 F. App'x 794, 797 (3d Cir. 2015) (cleaned up); *see also Smith v. Shop Rite*, Civil Action No. 3:17-cv-0907, 2018 WL 2424136, at *2 (M.D. Pa. May 9, 2018) (noting that although "[a] complaint by a *pro se* litigant is to be liberally construed," "*pro se* litigants still must allege sufficient facts in their complaint to support a claim" (cleaned up)); *Strader v. U.S. Bank Nat'l Ass'n*, Civil Action No. 2:17-cv-684, 2018 WL 741425, at *5 n.8 (W.D. Pa. Feb. 7, 2018) ("It is true that *pro se* plaintiffs are not held to the same standard as lawyers when the Court analyzes formal pleadings, but any pleading must still contain sufficient factual allegations that, when accepted as true, state a claim to relief that is plausible on its face." (cleaned up)).

## III.    DISCUSSION

Plaintiff brings this suit against the Octorara Defendants, the Detective Defendants, and Defendant Ryan pursuant to state and federal statutes, invoking several constitutional amendments. First, the Court provides a brief overview of the nature of Plaintiff's individual capacity claims under Section 1983. Then we address Plaintiff's First Amendment claims and Plaintiff's Sunshine Act claims. Next, we address Plaintiff's assertion that the Octorara Defendants violated his right to equal protection under the Fourteenth Amendment. Finally, the

Court evaluates whether Plaintiff has stated a claim for civil rights conspiracy.[12]

### A.     Section 1983

Plaintiff brings Counts I, II, III, IV, V, VI, and VII under Section 1983, alleging that the Octorara Defendants, Detective Defendants, and Defendant Ryan violated his constitutional rights.  But before considering whether Plaintiff has stated a claim against these parties, the Court must determine whether Plaintiff has satisfied the threshold pleading requirements for a civil rights action.  Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…, subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law….

42 U.S.C. § 1983.  Here, Plaintiff invokes Section 1983 against Defendants in their individual capacities.  (*See* Doc. No. 1 at ¶ 19 (explaining that Defendants were "not acting in their public servant capacity, but acting in their private person capacity, or under 'color of law'").

Public officials can be sued in either their individual or their official capacities, but individual capacity suits "seek to impose personal liability upon a government official for actions he [or she] takes under color of state law." *Kentucky v. Graham,* 473 U.S. 159, 165 (1985); *Melo v. Hafer*, 912 F.2d 628, 637 (3d Cir. 1990), *aff'd*, 502 U.S. 21 (1991) ("individual capacity suits may be brought against government officials who acted under color of state law").  "In such a case, the plaintiff need only show that the official, acting under color of state law, caused the deprivation of a federal right." *Judge v. Shikellamy Sch. Dist.*, 135 F. Supp. 3d 284, 300 (M.D. Pa. 2015), *aff'd*, 905 F.3d 122 (3d Cir. 2018). "When a plaintiff brings a § 1983 claim against a

---

[12] As explained in the Court's Memorandum published on March 31, 2023, Counts XIII and IX are not viable causes of action because they assert civil claims under criminal statutes that do not provide a private remedy.  (*See* Doc. No. 278.)  For this reason, the Court will dismiss Counts XIII and IX as against the Octorara Defendants, the Detective Defendants, and Defendant Ryan.

defendant in his or her individual capacity, the plaintiff must establish that the defendant had "personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Byars v. Sch. Dist. of Phila.*, 942 F. Supp. 2d 552, 569 (E.D. Pa. 2013) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  Personal involvement can be demonstrated through "allegations of personal direction or of actual knowledge and acquiescence." *Id.*

With this background in mind, the Court turns to whether Plaintiff has stated any claim upon which relief can be granted against Defendants under § 1983.

### 1.   *Claims Against the Detective Defendants and Defendant Ryan*

Plaintiff has identified the Detective Defendants and Defendant Ryan in the "Defendant Matrix" under Counts I, II, III, IV, VI, and VII (*see* Doc. No. 1 at 100–01), which cite violations of Plaintiff's First Amendment and Fourteenth Amendment rights in connection with the school board's policies, including Policy 903.  Plaintiff does not, however, allege any facts in his Complaint that demonstrate the personal involvement of Detective Defendants or Defendant Ryan in connection with these claims.

Beginning with the First Amendment claims, Plaintiff fails to demonstrate that either the Detective Defendants or Defendant Ryan were responsible for drafting, approving, or enforcing the school board's policies.[13]  The Court finds that the Complaint is devoid of any facts that

---

[13] The Detective Defendants argue that Plaintiff's Complaint should be dismissed for legal frivolity under 28 U.S.C. § 1915(c)(2)(B)(i), which provides: "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that the action or appeal if frivolous or malicious."  (Doc. No. 204 at 8.)  To this end, the Detective Defendants assert that: "Law enforcement especially (and to a great degree more recently, school districts) have been subjected to outlandish accusations (and acts of violence and disruption) – all based on QAnon-type conspiracies borne of a misguided attempt to advance political or philosophical beliefs."  (*Id.* at 9–10.)  The Court disagrees with the Detective Defendants' evaluation of Plaintiff's Complaint.  A complaint is "frivolous" if it "lacks an arguable basis either in law or in fact," thereby "embrac[ing] not only the inarguable legal conclusion, but also the fanciful factual allegation."  *Neitzke v. Williams*, 490 U.S. 319,

connect these parties, in their individual capacities as law enforcement officers and as district

attorney, to any control over Octorara School Board procedure.  Plaintiff does not articulate how

the Detective Defendants or Defendant Ryan could have written Octorara School Board's

policies, or how the Detective Defendants or Defendant Ryan could have authorized the

administration of those policies against Plaintiff.  Thus, he cannot sustain the First Amendment

claims in Counts I, III, IV, VI, and VII against them.

Further, to the extent Plaintiff asserts a Fourteenth Amendment equal protection claim

against the Detective Defendants and Defendant Ryan in Count II, Plaintiff fails to plausibly

state any facts that would demonstrate he was treated different by these defendants from other

similarly situated individuals.  Plaintiff asserts that his public speeches at Octorara School Board

meetings were censored by the "Chester County Detectives" and the "District Attorney's office"

and that the enforcement of the Octorara School Board's policies by these parties "deprived and

continue to deprive Plaintiff of the right to free speech in violation of the First and Fourteenth

Amendments to the United States Constitution."[14]  (Doc. No. 1 at ¶¶ 360, 364.)  But as we have

---

325 (1989).  For the reasons set out within, the Court finds that Plaintiff has stated several claims upon
which relief may be granted, based on a litany of discernable facts pleaded in the Complaint.  Moreover,
Plaintiff's Complaint does not provide any basis for Detective Defendants to compare it to QAnon-type
conspiracies, and Plaintiff disavows any association with "QAnon-type conspiracies."  (*See* Doc. No. 275
at 4 (Plaintiff does not believe in "nonsense such as QAnon.").)  At most, Plaintiff's Complaint illustrates
a passion for the United States Constitution.

[14] The only other allegations that may implicate the Detective Defendants or Defendant Ryan in an equal
protection claim are conclusory.  *See Jones v. Sorbu,* No. 20-CV-5270, 2021 WL 398494, at *9 (E.D. Pa.
Feb. 4, 2021) ("class of one" equal protection claim failed because plaintiff's allegations were "entirely
conclusory").  Plaintiff generally alleges that all Defendants, including the Detective Defendants and
Defendant Ryan, violated his Fourteenth Amendment rights by instigating a crusade of false allegations
and fictitious narratives against Plaintiff to silence him at school board meetings.  (*See id.* at ¶¶ 363, 365.)
But Plaintiff's Complaint does not contain any allegations that he was otherwise treated differently from
other similarly situated individuals by the Detective Defendants or Defendant Ryan.  "General
accusations and the invocation of the Equal Protection Clause are not enough."  *Phillips*, 515 F.3d at 245
("Phillips' complaint does not contain specific allegations that he was treated differently.  The facts
section of the Complaint reveals the egregious actions of various individuals at the 911 computer center—
actions that are alleged to have led to Phillips' death.  However, there is no allegation that these actions

already discussed, Plaintiff has not pleaded any facts to demonstrate that the Detective

Defendants or Defendant Ryan, in their individual capacities as law enforcement officers and as

district attorney, were authorized to enact or apply the Octorara School Board's policies against

Plaintiff.  Thus, insofar as Plaintiff alleges that the Detective Defendants or Defendant Ryan

enforced the Octorara School Board's policies against Plaintiff in a disparate manner, Plaintiff

cannot sustain an equal protection claim.

Accordingly, in the context of these claims, Plaintiff has failed to demonstrate that the

Detective Defendants and Defendant Ryan had "personal involvement in the alleged wrongs," as

required for individual liability under Section 1983.  *Byars*, 942 F. Supp. 2d at 569; *see also*

*Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005) ("In contrast to the personal involvement

that the Third Circuit rightly requires for a civil rights complaint, Evancho's amended complaint

merely hypothesizes that Attorney General Fisher may have been somehow involved simply

because of his position as the head of the Office of the Attorney General.").  Similarly, he also

failed to make "a short and plain statement" under Federal Rule of Civil Procedure 8(a), showing

that the Detective Defendants and Defendant Ryan's actions were unlawful under the First and

Fourteenth Amendments.  *See* Fed. R. Civ. P. 8(a); *see also Garrett v. Wexford Health*, 938 F.3d

69, 92 (3d Cir. 2019) ("Conclusory allegations of liability are insufficient."); *Jones*, 2021 WL

398494, at *10 ("The allegation against Murray is too vague and ambiguous for the Defendant to

be expected to respond to it, because it never asserts *how* Murray's conduct impacted Jones's

hearings, inmate classification, or liberty interests." (emphasis in original).).

---

resulted in him being treated differently from other individuals—individuals whose personal information
is in the 911 database."); *Jeannot v. Phila. Hous. Auth.*, 356 F. Supp. 3d 440, 452 (E.D. Pa. 2018)
("Jeannot cannot satisfy the first element, as he does not allege the existence of any similarly situated
individuals who were treated differently.").  In any event, these allegations are more appropriately
considered in support of Plaintiff's Count V, in which he brings a civil rights conspiracy claim against the
Octorara Defendants, Detective Defendants, and Defendant Ryan.

For this reason, the Court finds that Plaintiff cannot sustain the First Amendment or Fourteenth Amendment challenges alleged in Counts I, II, III, IV, VI and VII as against the Detective Defendants and Defendant Ryan.  To the extent Plaintiff also implicates these defendants in Count V for civil rights conspiracy, the Court considers those discrete allegations in its discussion of that claim below.[15]

### 2.    *Claims Against the Octorara Defendants*

The Octorara Defendants argue that dismissal is warranted as to several defendants among their cohort because "Defendants Bowman, Curtis, Ganow, Hurley, Koennecker, Norris, Yelovich, and Zimmerman are not referenced even once by either name or title in any of the hundreds of numbered paragraphs in the Complaint."  (Doc. No. 215-1 at 3.)  They contend that Plaintiff's Complaint should be dismissed because Plaintiff does not give these specific defendants "any basis on which to respond to the Complaint."  (*Id.*)  And they argue that Defendant Hardy should be dismissed for this same reason, claiming that Plaintiff "gives no indication how or why Secretary Hardy should or could be held liable to the Plaintiff[.]"  (*Id.* at 11.)

Because Plaintiff brings these claims against the Octorara Defendants in their individual capacities under Section 1983, he must demonstrate how each of these specific actors played an "affirmative part" in the alleged deprivations.  *See Evancho*, 423 F.3d at 353; *see also Rode*, 845

---

[15] The Court acknowledges that Plaintiff alleges in Count I that all "Defendants" acted "in concert to deprive Plaintiff of their [sic] protected First Amendment rights" (Doc. No. 1 at ¶ 337), but that allegation is more suited to Count V, in which Plaintiff brings a civil rights conspiracy claim against the Octorara Defendants, Detective Defendants, and Defendant Ryan.  In his response to these parties' motions to dismiss, Plaintiff argues that he believes the cancellation of the school board meeting on February 14 and his subsequent stop by Pennsylvania State Police were a result of the Detective Defendants and Defendant Ryan informing the Octorara School Board that they had received emails from Plaintiff of an alleged criminal nature, which led the School Board to falsely believe there would be a "potential 'threat' by the mere appearance or presence of Plaintiff" at the meeting.  (Doc. No. 229 at 7; *see also* Doc No. 275 at 2–3.)

F.2d at 1207–08 ("A defendant in a civil rights action must have personal involvement in the alleged wrongs…. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."). But Plaintiff's Complaint does not satisfy this requirement as to these defendants. There are no explicit factual averments relating to the actions of Defendants Bowman, Curtis, Ganow, Hurley, Koennecker, Norris, Yelovich, Zimmerman, or Hardy in the body of the Complaint.[16] *See Evancho*, 423 F.3d at 353 ("[A] civil rights complaint is adequate where it states the conduct, time, place, and persons responsible."). Because the Complaint contains no information about these defendants' personal involvement, they cannot respond substantively to the factual and legal grounds underlying Plaintiff's Complaint. *See id*. at 354 ("Moreover, it is not possible for Attorney General Fisher, in his individual capacity, to frame an answer to Evancho's amended complaint because it alleges no specific act by him relating to her transfer.").

The Octorara Defendants also cite *Cutler v. Pelosi*, Civil Action No. 19-834, 2020 WL 529895 (E.D. Pa. Feb 3, 2020) for the proposition that, where a plaintiff "makes absolutely no mention" of the defendants in the complaint, "other than including them in the caption and introductory paragraphs that identify the parties," the complaint should be dismissed. *Id*. at *2. Indeed, Plaintiff identifies Defendants Bowman, Curtis, Ganow, Hurley, Koennecker, Norris, Yelovich, Zimmerman, and Hardy only in the caption of the Complaint and in the "Defendant

---

[16] The Court notes that although the Complaint lacks specific allegations as to these *individuals*, there is a multitude of allegations against the Octorara School Board, as an *entity*, in the Complaint. If Plaintiff had named these defendants in their official capacity as school board members, then he would have been able to sue the Octorara School Board in its entirety, and perhaps the outcome of the Court's analysis would have been different. *See Graham*, 473 U.S. at 165–66 ("Official-capacity suits, in contrast [to individual capacity suits], generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." (internal citations omitted)).

Matrix."[17]  (*See* Doc. No. 1 at 1, 101.)  Under Rule 8(a), a complaint should set out what "each defendant is alleged to have done and how each defendant is liable to the Plaintiff."  *Cutler*, 2020 WL 529895, at *1.  Again, the Complaint is devoid of specific factual allegations against these parties.  *See Hudson v. McKeesport Police Chief*, 244 F. App'x 519, 522 (3d Cir. 2007) (affirming dismissal of complaint where Plaintiff "merely includes Fath in the caption of his complaint and does not provide any basis for a claim against him"); *Cutler*, 2020 WL 529895, at *2 ("Plaintiff's Complaint makes no allegation as to how any of these defendants allegedly took part in his claims[.]").  For these reasons, the Court finds that Plaintiff cannot sustain any of the claims alleged Counts I, II, III, IV, V, VI, VII and X against Defendants Bowman, Curtis, Ganow, Hurley, Koennecker, Norris, Yelovich, Zimmerman, and Hardy.

However, by addressing the specific allegations against Defendants Orner, Fox, and Propper in their motion to dismiss (*see* Doc. No. 215-1 at 11–21), the Octorara Defendants appear to acknowledge that Plaintiff has pleaded *some* facts that implicate those defendants' personal involvement in the events underlying this suit.  Thus, with the exception of Plaintiff's civil rights conspiracy claim, the Court continues its analysis of Plaintiff's claims against Defendants Orner, Fox, and Propper (hereafter, the "Octorara Defendants"), only.

### B.    First Amendment (Counts I, III, IV, VI, VII)

Plaintiff's First Amendment claims are embodied in Counts I, III, IV, VI, and VII.  Broadly speaking, those counts argue that Policy 903 is unconstitutional on its face and as applied to Plaintiff, that the board's social media policy is unconstitutional, and that the board

---

[17] Notably, Defendant Yelovich has been omitted from the "Defendant Matrix" entirely.  (*See* Doc. No. 1 at 100–01.)

impermissibly retaliated against Plaintiff for attempting to invoke his right to free speech.[18]

### 1. Policy 903

"The Third Circuit has explained that there are two types of First Amendment challenges: (1) a facial challenge and (2) an as-applied constitutional challenge." *Dankanich v. Pratt*, Civil Action No. 19-735, 2020 WL 7227249, at *5 (E.D. Pa. Dec. 8, 2020), *aff'd*, No. 21-1008, 2021 WL 5832281 (3d Cir. Dec. 9, 2021) (citing *United States v. Marcavage*, 609 F.3d 264, 273–74 (3d Cir. 2010)). "A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." *Id.* "An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Id.* Plaintiff advances both attacks; he asserts that Policy 903 is facially unconstitutional, and that the Octorara Defendants' application of Policy 903 deprived him of his right to free speech and his right to petition the government for redress of his grievances.[19]

---

[18] Counts I, III, IV, VI, and VII each arise under the First Amendment. Counts I, III, VI, and VII are duplicative causes of action, all entitled, "FACIAL CHALLENGE TO OCTORARA SCHOOL POLICY 903, SPEECH CONTENT." (Doc. No. 1 at 66, 80, 87 (emphasis in original).) Count VII specifically brings a facial challenge to Policy 903 based on vagueness. (*Id.* at 88.) Count I also contains allegations of First Amendment retaliation. Count IV is entitled "AS-APPLIED CHALLENGE TO OCTORARA POLICY 903, SPEECH CONTENT." (*Id.* at 83 (emphasis in original).) Finally, Counts I and IV bring facial and as-applied challenges to Octorara School District's social media policy. Although Plaintiff alleges within Count I that the Octorara Defendants engaged in "prior restraint" by enacting and enforcing Policy 903 against him (*id.* at ¶ 341), beyond this sole mention of the term, he undertakes no further development of this potential claim. *See Nat'l Ass'n for the Advancement of Multijurisdictional Prac. (NAAMJP) v. Castille*, 66 F. Supp. 3d 633, 656 (E.D. Pa. 2014), *aff'd sub nom. Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Castille*, 799 F.3d 216 (3d Cir. 2015) ("To strike down a law as an unconstitutional prior restraint, the law under scrutiny must at least require government approval before engaging in speech, and the law must give the government discretion to grant or deny the approval.").

[19] Plaintiff invokes his right to petition, in addition to his right to free speech, under the First Amendment. (*See* Doc. No. 1 at 80.) He argues that "[p]ublic comment periods at school board meetings are fora whose purpose, in large part, is to enable people to exercise their fundamental First Amendment right of petition." (*Id.* at ¶ 375.) The right to petition "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public

The parties do not dispute that, for purposes of the Court's First Amendment analysis as to Policy 903, a school board meeting is considered a limited public forum.  (*See* Doc. No. 215-1 at 18; Doc. No. 1 at ¶ 188 ("The Octorara School Board meeting is a limited public forum, where taxpayers are able to speak at the appropriate time, appropriate place and the appropriate manner in a public building on public property.").)  *See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017) (a school board meeting is a limited public forum). "A governmental entity creates a limited public forum when it provides for a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Galena v. Leone*, 638 F.3d 186, 198 (3d Cir. 2011) (quoting *Pleasant Grove City v. Summum,* 555 U.S. 460, 470 (2009)).

In a limited public forum, "content-based restraints are permitted, so long as they are designed to confine the forum to the limited and legitimate purposes for which it was created." *Id.* at 199 (citing *Eichenlaub v. Twp. of Indiana,* 385 F.3d 274, 280 (3d Cir. 2004)).  A content-based restriction may not, however, restrict speech based on "specific motivating ideology or the opinion or perspective of the speaker." *Id.*  The government may also restrict speech in a content-neutral way by restricting "the time, place, and manner of speech, as long as those restrictions are reasonable and serve the purpose for which the government created the limited

---

exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).  The Supreme Court has cautioned that "[c]ourts should not presume there is always an essential equivalence in the two Clauses or that Speech Clause precedents necessarily and in every case resolve Petition Clause claims." *Guarnieri*, 564 U.S. 379, 388 (2011).  But here, the facts and legal arguments underlying Plaintiff's speech and petition claims substantially overlap; the claims are virtually identical.  For this reason, we discuss Plaintiff's claims together.  *See Mirabella v. Villard*, 853 F.3d 641, 654 (3d Cir. 2017) (explaining that where speech also implicates the right to petition, "courts have generally applied Speech Clause precedent, rather than any freestanding Petition Clause doctrine"); *Galena*, 638 F.3d at 197 n.7 ("Inasmuch as, for the purposes of this case, as the tests under the speech and petition clauses of the First Amendment are the same, we will discuss the claims together as a single claim."); *see also Guarnieri*, 564 U.S. at 388 ("The right to speak and the right to petition are cognate rights.").

public forum." *Id.*  A time, place, and manner restriction is reasonable "if it is (1) content-neutral, (2) narrowly tailored to serve an important governmental interest, and (3) leaves open ample alternatives for communication of information." *Id.* (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791–803 (1989)).  But content-neutral restrictions, even if reasonable, cannot be applied to foreclose a specific viewpoint. *See id.*  In sum, governmental entities that have established limited public forums "may impose restrictions on speech that are reasonable and viewpoint-neutral." *Christian Legal Soc. Chapter of the Univ. of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010).

### a.      Facial Challenge

Plaintiff argues that Policy 903 is facially unconstitutional on several bases.  He contends that Policy 903 imposes "arbitrary and capricious" (Doc. No. 1 at ¶ 337) restrictions on his First Amendment rights by: (1) compelling individuals to state their name and residency (*id.* at ¶ 389); (2) prohibiting individuals from directly addressing individual board members (*id.* at ¶ 348); and (3) barring statements that are "abusive," "irrelevant," "offensive," "inappropriate," or "personal attacks" (*id.* at ¶¶ 348–49).  We address each of these arguments in turn.

*Name and Residency Requirement*.  Plaintiff contends that Policy 903's requirement to announce a speaker's name and residing municipality is an impermissibly broad speech restriction, and that the requirement constitutes compelled speech in violation of the First Amendment.  (*See* Doc. No. 251 at 18 ("To enforce a policy which entirely precludes non-residents from participation is overly broad and an unlawful violation of Free Speech."); Doc. No. 1 at ¶¶ 389–90 ("The right to speak freely includes the right to not speak. …. Enforcement of this requirement is meant to intimidate speakers who would express controversial views.").)  The Octorara Defendants respond that they are authorized by the Pennsylvania Sunshine Act to limit

access to the school board's public comment period to only "residents" and "taxpayers" of the

district.[20]  (Doc. No. 215-1 at 16 (quoting 65 Pa. Cons. Stat.  §§ 710.1) ("The board or council

of a political subdivision or of an authority created by a political subdivision shall provide a

reasonable opportunity at each advertised regular meeting and advertised special meeting for

***residents*** of the political subdivision…or for ***taxpayers*** of the political subdivision…***or for

both***[.]") (emphasis in original).)  The Octorara Defendants assert that this requirement is

"constitutionally sound."  (*Id.* at 18.)  Indeed, courts have upheld a bona fide residency

requirement as a reasonable speech restriction in a limited public forum.  *See, e.g., Rowe v. City*

---

[20] The Octorara Defendants also assert that Plaintiff lacks standing to challenge Policy 903 for this reason. That is, Plaintiff "does not allege in the Complaint that he is either a 'resident' or a 'taxpayer' of the Octorara School District" and so "there is nothing in the Complaint to suggest he had any right to speak at any School Board meeting."  (Doc. No. 215-1 at 17 (cleaned up).)  "Absent that right, the application of Board Policy 903 could not have caused the Plaintiff any particular injury that gives him standing under Article III to pursue the causes of action[.]"  (*Id.* at 17–18.)  But Plaintiff has pleaded in the Complaint that he is "a resident/taxpayer of the Commonwealth of Pennsylvania, a resident within Chester County, and is a taxpayer whose funds provide him standing."  (Doc. No. 1 at ¶ 78.)  He also pleaded that he previously complied with Policy 903 before making a public comment at the January 24 school board meeting.  (*Id.* at ¶ 79 ("Eventually the Plaintiff stated a municipality, within the jurisdiction of the Octorara School district, which Plaintiff has standing and conducts business.").)  And Plaintiff refused to comply with this same requirement at the March 21 school board meeting, from which he was ultimately removed, and then banned permanently from Octorara School District property.  (*Id.* at ¶¶ 159–89.)  We remind the Octorara Defendants that, to establish standing at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633–34 (3d Cir. 2017) ("In the context of a motion to dismiss, we have held that the injury-in-fact element is not Mount Everest.").  Moreover, even if we found that Plaintiff was invoking a constitutional claim on behalf of third parties, we note that in First Amendment cases, "courts relax the prudential requirement that a litigant raise his own rights and interests."  *Serv. Emps. Int'l Union, Loc. 3 v. Municipality of Mt. Lebanon*, 446 F.3d 419, 423 (3d Cir. 2006).  "Courts do so out of concern that protected speech will be chilled by the statute.  Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  *Id.*  For these reasons, the Court is satisfied that, at least at this stage of litigation, Plaintiff has met his burden as to standing.  *See Pa. Prot. & Advoc., Inc. v. Houston*, 136 F. Supp. 2d 353, 360 (E.D. Pa. 2001) ("The standard for determining standing is not static," and "elements of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation.").

*of Cocoa*, 358 F.3d 800, 803–04 (11th Cir. 2004) ("It is reasonable for a city to restrict the individuals who may speak at meetings to those individuals who have a direct stake in the business of the city—*e.g.*, citizens of the city or those who receive a utility service from the city—so long as that restriction is not based on the speaker's viewpoint.  A bona fide residency requirement, as we have here, does not restrict speech based on a speaker's *viewpoint* but instead restricts speech at meetings on the basis of residency.") (emphasis in original).  Accordingly, Plaintiff has failed to state a claim as to this particular facial challenge.

But that is not the end of our analysis, as Plaintiff does not only contest the constitutionality of the residency requirement; he also contests the requirement that he must publicly *announce* his name and municipality before making a public comment.[21]  (Doc. No. 1 at ¶ 390 ("To be sure, verifying a speakers' name and municipality, may advance Octorara's interest in limiting public comment access to its residents and taxpayers.  *But there is no need to require that speakers publicly announce their address, and direct potential reprisal to their homes*.") (emphasis added).)  The right to free speech "includes both the right to speak freely and the right to refrain from speaking at all."  *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018).  In *Marshall v. Amuso*, 571 F. Supp. 3d 412 (E.D. Pa. 2021), a court in this district found that a school board's policy requiring public speakers to "preface their comments by an announcement of their name, address, and group affiliation if applicable" at school board meetings was unconstitutional compelled speech.  *Id.* at 418, 426.  The court acknowledged that the school board could limit public comments to "students,

---

[21] The Octorara Defendants did not respond to this argument (and indeed, did not respond to many of Plaintiff's arguments) likely because of their refusal to undertake the exercise of what they describe as, "painstakingly sifting through what amounts to almost two dozen disjointed and disorienting allegations one by one."  (Doc. No. 215-1 at 16.)  The Court advises that such comments are not helpful, and the Octorara Defendants must review all legal documents filed against them, no matter how laborious.

employees, and residents with the District," but that "requiring the speaker to announce their specific home address is an unreasonable restriction" because of "the chilling effect of being forced to announce to all present one's actual home address before speaking on a hotly-contested issue." *Id.* at 426.

As in *Marshall*, Plaintiff argues that the enforcement of the announcement requirement is meant to intimidate speakers who may fear reprisal for expressing controversial views, thereby chilling the exercise of their First Amendment rights. (Doc. No. 1 at ¶¶ 389–90.) But *Marshall* is distinguishable. Policy 903 calls for the announcement of a speaker's name and municipality—not the speaker's specific home address. Thus, the same chilling effect that the court identified in *Marshall* is not at issue here. In fact, the court in *Marshall* suggested that its concerns were abated when the school board later changed its policy to require speakers to provide only their township, rather than their specific address. *See* 571 F. Supp. 3d at 426 ("And in meetings since the June 2021 meeting, speakers have simply provided their township when signing in and speaking."). The Court reiterates that it is not unreasonable to limit speaking opportunities to residents in a limited public forum. For these reasons, the Court finds that Plaintiff has not stated a claim upon which relief can be granted for a facial challenge to this provision of the policy.

*Prohibition on Addressing Board Members Individually.* Plaintiff next contends that Policy 903's prohibition on "personally addressing or questioning school board members" violates the First Amendment because it is not a "reasonable regulation that advance[s] the meetings' purposes, but rather serve[s] only to suppress officially disfavored views." (*Id.* at ¶ 348.) Plaintiff appears to argue that Policy 903's provision, which requires all statements to be "directed to the presiding officer" and that "no participant may address or question Board

directors individually" is, on its face, impermissible viewpoint discrimination.  The Court

disagrees.  This provision does not prohibit speakers from discussing certain topics, nor does it

prohibit criticism (or praise) of the board or any of its individual members.  Requiring the

speaker to address the presiding officer—in this case, President Fox—rather than the individual

board members, does not preclude comments based on the speaker's viewpoint.[22]  *See Moms for*

*Liberty - Brevard Cnty., FL v. Brevard Pub. Sch.*, 582 F. Supp. 3d 1214, 1220 (M.D. Fla. 2022),

*aff'd*, No. 22-10297, 2022 WL 17091924 (11th Cir. Nov. 21, 2022) (approving school board

policy that required speakers to direct comments to the chair because individual members "do

not possess the power of the Board").  On its face, Policy 903 permits speakers to make

comments and express opinions *about* individual board members; it merely requires that those

comments be *addressed* to the presiding officer.  Thus, the provision is both content and

viewpoint neutral.

Still, Plaintiff contends that this provision is not a reasonable regulation that advances the

school board meeting's purpose.  (*See* Doc. No. ¶ 336 ("This intention to speak freely outweighs

any interest in promoting the efficient operation and administration of government services when

time is specifically allocated for public comment.").)  But it is reasonable for the Octorara

School Board to streamline the direction of public comments for the orderly administration of its

meetings, and to prevent possible disruptions that might arise from allowing multiple board

---

[22] The school board would likely not be able to enforce a policy that prohibits comments that are "personally directed" at individual board members—but Policy 903 invokes no such language.  *See Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893–95 (6th Cir. 2021) ("The restrictions on 'antagonistic,' 'abusive' and 'personally directed' speech prohibit speech because [the restriction] opposes, or offends, the Board or members of the public, in violation of the First Amendment."); *Marshall*, 571 F. Supp. 3d at 422–26 (prohibiting "personally directed" comments would preclude speakers from offering opinions about individual school board members or employees); *Moore v. Asbury Park Bd. of Educ.*, Civil Action No. 05-2971 MLC, 2005 WL 2033687, at *11–13 (D.N.J. Aug. 23, 2005) (prohibiting comments that were "personally directed" at school board members was a "content-based restriction on speech" and had "the effect of an impermissible viewpoint-based restraint").

members to engage with speakers.  *See Grayned v. City of Rockford*, 408 U.S. 104, 119 (1972)

(finding that a city has a compelling interest in undisrupted school session); *Rowe*, 358 F.3d at

803 ("There is a significant governmental interest in conducting orderly, efficient meetings of

public bodies."); *Moms for Liberty*, 582 F. Supp. 3d at 1220 n.7 ("The requirement to address the

chair also encourages, rather than chills, the freedom of speech because it 'turns down the heat'

and 'gives people a sense of fairness' in hearing all viewpoints.").  For these reasons, the Court

finds that Plaintiff has not stated a claim upon which relief can be granted for a facial challenge

to this provision of the policy.

    *Vague and Overbroad Restrictions.*  Finally, Plaintiff contends that Policy 903's

prohibitions on statements that are "abusive," "irrelevant," "offensive," "inappropriate," or

"personal attacks" are impermissibly "overbroad" and "vague" limits on speech.  (Doc. No. 1 at

¶¶ 348–49, 394; *see also id.* at ¶ 346 ("It is axiomatic that criticism of school officials, school

employees, school rules, regulations policies, and school curricula are germane to the business of

school boards—regardless of whether the school board members want to hear such criticism or

believe it is fair.").)  But the Court's review of Policy 903 reveals no such restrictive language,

except that it permits the presiding offer to interrupt or terminate a participant's statement when

the comment is "irrelevant."[23]

    "Vagueness and overbreadth are logically related and similar doctrines."  *Marshall*, 571

F. Supp. 3d at 425 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983)).  A policy is

---

[23] The words "abusive," "offensive," "inappropriate" and "personal attacks," do not appear in Policy 903.
To the extent Plaintiff is attempting to challenge Policy 903's prohibition of "obscene" comments, this
facial challenge also fails.  *See Mama Bears of Forsyth Cnty. v. McCall*, No. 2:22-CV-142-RWS, 2022
WL 18110246, at *9 (N.D. Ga. Nov. 16, 2022) ("Plaintiffs' facial challenge to the public participation
policy's obscenity provision clearly fails.  The Supreme Court held nearly fifty years ago that obscene
material is not protected by the First Amendment.  And in the years since, many courts across the country
have reinforced that principle, in relevant part by upholding school board policies prohibiting obscene
comments from the public.").

unconstitutionally vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," whereas a policy is unconstitutionally overbroad "if it reaches too much expression that is protected by the Constitution." *Id.* at 423, 425. As to vagueness, "although there is no requirement of narrow tailoring in a limited public forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 423–24 (quoting *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018)) (cleaned up). "While some degree of discretion in how to apply a given policy is necessary, 'that discretion must be guided by objective, workable standards' to avoid the moderator's own beliefs shaping his or her 'views on what counts' as a policy violation." *Id.* As to overbreadth, "a policy can be struck down only if no reasonable limiting construction is available that would render the policy constitutional." *Id.* (citing *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3d Cir. 2002)).

The Court acknowledges that generally precluding "irrelevant" comments in a limited public forum has been found to be vague and overbroad. *See Marshall*, 571 F. Supp. 3d at 424–26. Specifically, where a school board presented "no examples of guidance or other interpretive tools" to assist in the application of its policies, a limitation on "irrelevant" comments was found to be "irreparably clothed in subjectivity." *Id.* at 424. But Policy 903 clearly sets out the parameters of relevancy by describing the two opportunities for public comment: the first "is intended for public comment or questions *related to posted agenda items*"; the second "is intended for public comment or questions on *any topic related to district business*." As a limited public forum, a school board meeting "is not open for endless public commentary speech but instead is simply a limited platform to discuss the topic at hand." *Danielson v. Chester Twp.*, No. CIV.A. 13-5427 JLL, 2014 WL 3362435, at *4 (D.N.J. July 9, 2014) (quoting *Rowe*, 358

F.3d at 803).  Indeed, Plaintiff acknowledges that "[t]he public comment periods of the Octorara

school board meetings are limited public fora, to be used by Octorara residents and 'taxpayers'

…*to discuss matters of concern related to the school district.*"  (Doc. No. 1 at ¶ 344 (emphasis

added)); *see also City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S.

167, 176 n.6 (1976) ("Plainly, public bodies may confine their meetings to specified subject

matter[.]"); *Eichenlaub*, 385 F.3d at 281 ("As we have observed, speech at a citizen's forum may

be limited according to its germaneness to the purpose of the meeting.").

To that end, courts have permitted content-neutral restrictions such as the one in Policy

903, which allows a presiding officer to interrupt or terminate irrelevant comments, because they

serve the significant government interest of preventing disruption and ensuring the orderly

administration of public meetings.  *See Jones v. Heyman*, 888 F.2d 1328, 1333 (11th Cir. 1989)

("To hold otherwise—to deny the presiding officer the authority to regulate irrelevant debate and

disruptive behavior at a public meeting—would cause such meetings to drag on interminably,

and deny others the opportunity to voice their opinions."); *Miller v. N. Belle Vernon Borough*,

No. C.A.8-1435, 2010 WL 4388069, at *5 (W.D. Pa. Oct. 29, 2010) ("For example, if a

reasonable time, place, or manner limit is enforced in order to keep a meeting under control, and

free from irrelevant disruption, then it may be permissible."); *Zapach v. Dismuke*, 134 F. Supp.

2d 682, 692 (E.D. Pa. 2001) ("If the Defendant had indeed curtailed the Plaintiff's speech

because it was irrelevant to the appeal before the Zoning Hearing Board, the restriction would be

considered content-neutral, and we would uphold the Defendant's action as a valid restriction

that was justified without reference to content, was narrowly tailored to serve a significant

governmental interest, and left open ample alternative channels for communication of the

information.  The government has a significant interest in the orderly and efficient conduct of its

business.").  The Court finds that Plaintiff has not stated a claim upon which relief can be granted for a facial challenge to this provision of Policy 903.

For the above-stated reasons, Plaintiff has failed to put forth a plausible facial First Amendment challenge against the identified provisions of Policy 903 and has therefore failed to state a claim upon which relief can be granted.

### b.   *As-Applied Challenge*

Miller also argues that certain provisions of Policy 903 have been unconstitutionally applied to him.  Specifically, he contends that the application of "Policy 903's prohibition on personally addressing or questioning school board members," and the application of Policy 903's prohibition of "irrelevant" comments, violated his First Amendment rights.[24]  (Doc. No. 1 at ¶ 382.)  He asserts that the school board utilized these provisions to censor his speech based on its content and viewpoint.  (*Id.*)  But as the Octorara Defendants point out, "nowhere in the Complaint does the Plaintiff allege that Board President Fox used Board Policy 903 to ***actually prevent*** the Plaintiff from speaking."  (Doc. No. 215-1 at 18–19 (emphasis in original).)  After reviewing Plaintiff's Complaint, the Court agrees with the Octorara Defendants.  Plaintiff alleges that he attended only two school board meetings—one on January 24 and one on March 21— before he was banned from school property.  (Doc. No. 1 at ¶¶ 72, 159.)  At the January 24 meeting, Plaintiff made a public comment without issue, during which he proceeded to "redress the board in their collective violation of sworn duties and oath to the constitution [sic]" and "informed the dais that they were all acting outside of their qualified immunity protection and unlawfully depriving plaintiff and other citizens [of] their constitutionally protected rights."  (*Id.*

---

[24] Plaintiff does not make an as-applied challenge as to the name and residency announcement provision of Policy 903.  (*See generally* Doc. No. 1.)

at ¶ 80.)  Following this comment, "Plaintiff returned to his seat."  (*Id.* at ¶ 81.)  At the March 21

meeting, Plaintiff chose not to make a public comment after President Fox requested that he

announce his name and municipality in accordance with Policy 903.  (*Id.* at ¶¶ 165–66.)  Plaintiff

pleads in the Complaint that he declined to do so, and that when he was "growing tired" of the

"unlawful statements" by President Fox, he "stood up to exit" and demanded that the police

arrest the board members.  (*Id.* at ¶¶ 166–67.)  It was only after that announcement that he was

removed from the meeting by police officers.[25]

  These allegations, accepted as true, do not demonstrate that the Octorara Defendants

wielded the identified provisions of Policy 903 to censor Plaintiff's speech based on content or

viewpoint.  To the contrary, Plaintiff was clearly permitted to criticize the board members at the

January 24 meeting and did so without President Fox interrupting or terminating his comment.

Plaintiff was similarly given the opportunity to make a public comment at the March 21 meeting

but elected not to speak once he was asked to comply with Policy 903.  Indeed, Plaintiff does not

plead in his Complaint that his comments were prohibited because he was "personally

addressing" board members, nor does he plead that his comments were impermissible because

they were "irrelevant."  Although Plaintiff indicates that he expressed unfavorable viewpoints

about the board during the January 24 meeting, he fails to otherwise specify the actual content

contained in his comments.  *See Scarborough v. Frederick Cnty. Sch. Bd.*, 517 F. Supp. 3d 569,

576–77 (W.D. Va. 2021) (a plaintiff need not provide a "verbatim" or "hard-copy" record of

---

[25] Notably, Plaintiff does not bring a facial challenge against the provisions of Policy 903 that permit the presiding officer to "request any individual to leave the meeting when that person does not observe reasonable decorum" and to "request the assistance of law enforcement officers to remove a disorderly person when the person's conduct interferes with the orderly progress of the meeting," nor does he bring an as-applied challenge to his removal from the school board meeting on March 21 in accordance with those provisions.  (*See* Doc. No. 215-1, Ex. 1 (letter from Defendant Orner confirming that Plaintiff was removed and banned from school board meetings because he caused a disruption).)

First Amendment statements at motion to dismiss stage but must at least describe "the nature and content" of the statements). At present, the Court can discern that Plaintiff was critical of the board, but the Court is unable to discern whether these specific provisions of Policy 903 were unconstitutionally applied to Plaintiff; namely, if the comments were, indeed, "personally directed" or "irrelevant." At present, Plaintiff's Complaint is devoid of facts to demonstrate that the Octorara Defendants used Policy 903 to circumscribe Plaintiff's speech. For this reason, Plaintiff fails to state a claim upon which relief can be granted.

### 2. *Social Media*

Plaintiff also challenges the constitutionality of Policy 816, which governs Octorara School District's social media activity.[26] Plaintiff alleges that the Octorara Defendants violated his and others' First Amendment rights "by precluding comments on social media websites with a page devoted to Octorara School District." (*Id.* at ¶ 337.) Plaintiff believes the enforcement of this policy censored his "online speech." (*Id.* at ¶ 381.) Policy 816 sets out the following guidelines for the operation of Octorara School District's social media accounts:

> The Board shall approve all official social media accounts created and/or maintained as district-owned accounts, including social media accounts for individual schools within the district. All district-owned social media accounts shall display the official name and logo of the district. The Board establishes district-owned social media accounts as a **nonpublic forum**[[27]] and directs school staff to

---

[26] Plaintiff did not attach a copy of Policy 816 to his Complaint, nor does he identify the policy in his Complaint or expressly raise this challenge as a separate cause of action. Nevertheless, the Court notes that several paragraphs of Plaintiff's Complaint, in both the background section and under counts alleging facial and as-applied challenges to Policy 903, mention Octorara Defendants' alleged censorship of Plaintiff's "online speech" on its social media accounts. (Doc. No. 1 at ¶¶ 300–07, 337, 359, 381.) The Court takes judicial notice of Policy 816, which is in the Octorara School Board Policy Manual on Octorara School District's website.

[27] The term "nonpublic" has been accepted in the Third Circuit as interchangeable with the term "limited public." *See Porter v. City of Phila.*, 975 F.3d 374, 387 (3d Cir. 2020) ("The 'nonpublic forum' has also sometimes been referred to as the 'limited public forum,' creating confusion about whether there is a difference between these two classifications. As we explained in *NAACP*, the Supreme Court recently

> disable functions allowing public users to comment or post information on district-owned social media accounts.

Octorara Area School District Website, *School Board – Policies*, "Policy 816 – District Social Media," https://go.boarddocs.com/pa/octo/Board.nsf/Public# (last visited March 28, 2023) (emphasis in original) ("Policy 816").

Policy 816 defines a "district-owned social media account" as "a social media account, regardless of platform, that is approved by the Board and operated by a designated district employee(s) and is designed to further the educational mission of the district by providing information to the school community and general public." (*Id.*) Policy 816 also offers its own definition of a "nonpublic forum," as a forum that is created "when a district-owned social media account enables members of the public to read and receive district information, but the district has not designated opportunity for expressive activity by the public, and no commenting or posting of information by members of the public is permitted. In terms of social media, the ability to comment, post or reply is disabled on the district's account for public users." (*Id.*)

Despite Policy 816's conclusory designation of Octorara School District's social media as "nonpublic" fora, there is debate among the Circuits regarding the appropriate forum classification for government-operated social media pages. Indeed, although most courts have concluded that social media pages—or components thereof—are "public," such that the First Amendment applies, most have done so without deciding what subcategory of public forum was created. *See Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), cert. granted, judgment vacated sub nom. *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) (finding that the interactive component of President's Twitter

---

has used the terms 'limited public forum' and 'nonpublic forum' interchangeably, suggesting that, if there is a distinction, these two categories are afforded the same treatment.").

account was a public forum but declining to identify which kind, because viewpoint

discrimination is impermissible in any public forum); *Davison v. Randall*, 912 F.3d 666, 687 (4th

Cir. 2019) (finding that a county board chair's Facebook page was a public forum and that users

could not be blocked based on their viewpoints, but expressly declining to specify whether the

forum was traditional, designated, or limited in nature); *Robinson v. Hunt Cnty.*, 921 F.3d 440,

448 (5th Cir. 2019) ("Because Robinson alleges viewpoint discrimination, it is immaterial

whether the Facebook page is analyzed as a limited or designated public forum."). *But see*

*Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1178–79 (9th Cir. 2022) (a school board created a

"designated public forum" where it permitted its social media to be "open and available to the

public without any restriction on the form or content of comments" and where the board "never

adopted any formal rules of decorum or etiquette for their pages" and "far from forbidding

comments, occasionally solicited feedback from constituents through their posts and responded

to individuals who left comments").

Here, too, Plaintiff alleges generally that Octorara School District's social media is a

"public" forum, and that the district's policy of disabling comments on all its social media

platforms amounts to viewpoint discrimination.  (*See* Doc. No. 1 at ¶ 302 ("It is well established

that government actors cannot prohibit speech when using *public* forums: They cannot stop

people from joining a public conversation on the social media account because of the views they

express on the topics at hand.  They cannot block critical voices from asking for government

services through the social media account because of those critical viewpoints.  They cannot

prevent people from being able to see social media posts that publicly announce government

information or policy because of their viewpoints.") (emphasis added).)  Because Plaintiff

challenges Policy 816 on the narrow issue of viewpoint discrimination, which is impermissible in

any public forum, we need not determine whether Octorara School District's social media accounts are, in fact, "nonpublic" fora.[28]  Indeed, the Octorara Defendants do not offer any arguments in support of that designation, nor do they dispute Plaintiff's general characterization that their social media accounts are, broadly, public fora.  At this stage, Court must view as true that these online spaces are "public" fora subject to First Amendment protection, and in which viewpoint discrimination is impermissible.  *See Robinson*, 921 F.3d at 448 (assuming for purposes of deciding motion to dismiss viewpoint discrimination claim that Sheriff's Office social media page was a public forum subject to First Amendment protection); *see also Knight*, 928 F.3d at 237 ("A public forum, as the Supreme Court has also made clear, need not be spatial or geographic and the same principles are applicable to a metaphysical forum.").

But here, the language of Policy 816 itself reveals no such discrimination.  The policy states that "no commenting or posting of information by members of the public is permitted" because the purpose of the district's social media pages is "providing information to the school community and general public" and the pages are explicitly "not designated opportunity for expressive activity by the public."[29]   Policy 816's categorical prohibition of comments on all

---

[28] Even if the Octorara Defendants had offered some argument in support of Policy 816's classification of the district's social media as "nonpublic", the Court is not convinced that it is appropriate to determine the specific type of forum at the motion to dismiss stage, without further examination of the district's *actual use* of its platforms.  *See Garnier*, 41 F.4th at 1178 ("The Trustees contend that they always intended their social media pages to be a 'one-way' channel of communication.  But what matters in forum analysis is what the government actually does—specifically, whether it consistently enforces the restrictions on use of the forum that it adopted.").  Moreover, the Circuits that have addressed this question have also explained that different components of a social media account may have different forum categorizations, depending on their usage.  *See, e.g., Davison*, 912 F.3d at 686 (explaining that the "curation" of the chair's Facebook feed and homepage was "materially different" from the "interactive component" of the page, specifically, "the portion of the middle column in which the public can post comments, reply to posts, and 'like' comments and posts").

[29] To the extent Plaintiff challenges the content posted on social media by the district itself, that content is government speech and is therefore not subject to First Amendment scrutiny.  "Under the government speech doctrine, the Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak about governmental endeavors."  *Knight*, 928 F.3d at 239 (cleaned

district social media accounts does not prohibit comments based on viewpoint.  Rather, Policy 816 forbids comments entirely; it does not ban comments or authorize the blocking or deletion of comments based on the opinions contained therein.  Plaintiff himself acknowledges that he has been unable to leave comments on the district's various social media pages because the interactive portions of the page have been completely disabled.  (Doc. No. 1 at ¶¶ 300–01 ("Octorara School District manages several public social media sites for conveying information to the public.  These consist of a Facebook page, a YouTube channel, and host a zoom for school board meetings…. All of these sites have been configured by public officials to preclude the ability for the general public to comment, thus prohibiting the Free Speech of concerned citizens.").)

Notably, Plaintiff does not allege that Policy 816 was unconstitutionally applied to him, specifically.  He does not allege that comments expressing viewpoints different than his own were permitted, nor that his comments were blocked or deleted because of the viewpoints he expressed.  And, again, Plaintiff fails to articulate the nature or the content of the comments he seeks to express.  In short, not only is Policy 816 facially viewpoint-neutral, but Plaintiff also fails to plead facts demonstrating that the Octorara Defendants applied Policy 816 against his viewpoints.  For these reasons, Plaintiff fails to state a claim upon which relief can be granted related to Policy 816.[30]

---

up); *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").  The Octorara School District, by way of the Octorara Defendants, is permitted to post and share its own content on its own social media accounts.  *See Knight*, 928 F.3d at 239 ("Everyone concedes that the President's initial tweets (meaning those that he produces himself) are government speech."); *Davison*, 912 F.3d at 686 ("To be sure, Randall's comments and curated references on the Chair's Facebook Page to other Pages, personal profiles, and websites amount to governmental speech.").

[30] Plaintiff also alleges in his Complaint that "invitation links" to the Octorara School Board's Zoom meetings were "not consistently provided to the public to gain access."  (Doc. No. 1 at ¶ 300.)  But

3. **Retaliation**

Finally, Plaintiff alleges that the Octorara Defendants deprived Plaintiff of his protected First Amendment rights "in retaliation for the free exercise of those rights by involving Pennsylvania State Troopers to execute an unlawful traffic stop" following his public comment at the January 24 meeting and his attempted attendance of the subsequently cancelled February 14 school board meeting.  (Doc. No. 1 at ¶ 350.)  Plaintiff also alleges that Defendants Orner and Fox, specifically, retaliated against him for exercising his First Amendment rights at the March 21 school board meeting, by "allegedly making a false report to Pennsylvania State Troopers for Plaintiff causing a disturbance."  (*Id.* at ¶ 351.)  We address these instances in turn.

To establish a claim that a public official retaliated against a private citizen in violation of the First Amendment, the citizen must establish that: "(1) he engaged in conduct or speech protected by First Amendment, (2) that public official took adverse action against the citizen, and (3) that the adverse action was prompted or caused by the citizen's exercise of First Amendment rights."  *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 431 (E.D. Pa. 2000) (cleaned up).  Typically, the burden then shifts to the defendant, who "may defeat the plaintiff's case by showing that they would have taken the same action even in the absence of the protected conduct."  *Palfrey v. Jefferson-Morgan Sch., Dist.*, No. CIV.A. 06-01372, 2008 WL 4412230, at *9 (W.D. Pa. Sept. 25, 2008), *aff'd*, 355 F. App'x 590 (3d Cir. 2009) (citing *Ambrose v. Twp. of*

---

Plaintiff also stated that the Octorara School Board transitioned away from broadcasting its school board meetings on Zoom in June 2022.  (*Id.* at ¶ 303.)  Therefore, we need not consider this claim any further. *See Marshall*, 571 F. Supp. 3d at 418 n.2 (declining to comment on school board's online meeting practices when online meetings had been discontinued with the return to in-person meetings).  We hold the same as to Plaintiff's allegations that the Octorara Defendants "preclude[ed] public interaction in live stream videos of public meetings" and "adopted a practice on Zoom to preclude public comments in a zoom chat feature during a live zoom."  (*Id.* at ¶¶ 304, 337.)  Notably, Plaintiff states only that he was not permitted to use the live chat and comment features during the Zoom board meeting—Plaintiff does not allege that the Octorara Defendants removed its usual opportunities for public comment altogether.

*Robinson*, 303 F.3d 488, 493 (3d Cir. 2002)).  But at this stage, the Octorara Defendants make no arguments in defense of Plaintiff's retaliation claims.

*State Police.*  Plaintiff's first retaliation claim arises out of an encounter with Pennsylvania State Police that he alleges occurred on February 14, following his attempt to attend a school board meeting that same evening.  With respect to the first prong, the Court finds that Plaintiff demonstrates that he engaged in conduct protected by the First Amendment. Plaintiff alleges that he previously spoke out against the school board at the January 24 meeting and that, following that meeting, he sent "notices" to the school board regarding his intent to speak at future meetings—such as the meeting on February 14.  (Doc. No. 1 at ¶¶ 75–90, 98.) Plaintiff's criticism of the school board during the January 24 meeting's public comment period, and his continued criticism of the school board in direct communication to the Octorara Defendants, is undoubtedly protected by the First Amendment.[31]  *See Marshall*, 571 F. Supp. 3d at 421 ("The First Amendment protections for free speech apply to speaking at public school board meetings."); *see also City of Madison, Joint Sch. Dist. No. 8*, 429 U.S. at 174–75 (holding that citizens, including teachers, enjoy the First Amendment right "to comment on matters of public interest in connection with the operation of public schools" at school board meetings). Thus, as to this specific conduct, we find that Plaintiff satisfies the first element of a First Amendment retaliation claim.

---

[31] Arguably, Plaintiff's attempt to attend the school board meeting on February 14 also qualifies as a protected First Amendment activity, but because we find that Plaintiff's conduct at the January 24 meeting sufficiently supports the first prong, the Court need not delve further into this question.  *Contra. Kowal v. Ferndale Area Sch. Dist.*, No. 3:18-CV-181, 2021 WL 5605257, at *9 (W.D. Pa. Nov. 29, 2021), *aff'd*, No. 21-3386, 2023 WL 110541 (3d Cir. Jan. 5, 2023) (plaintiff could not succeed on First Amendment retaliation claim where "nothing in the record indicates that Kowal was prohibited from attending any publicly held School Board meeting and/or speaking during any public comment period of any publicly held School Board meeting").

With respect to the second prong, Plaintiff must allege that he suffered a "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Mirabella*, 853 F.3d at 649. Plaintiff claims that when he attempted to attend the next school board meeting on February 14, he was turned away, having been met by Defendant Propper[32] at the door of the school and informed that the meeting was cancelled. Plaintiff claims that the school board acted in a retaliatory manner by "involving" Pennsylvania State Troopers in his attempt to attend the meeting (Doc. No. 1 at ¶ 351), which led the authorities to execute an allegedly "unlawful traffic stop" minutes after he left school property. (*Id.* at ¶¶ 130–31, 133 ("The Plaintiff, after concluding conversation with the principal returned to Plaintiff's vehicle and departed the school parking lot. Plaintiff was immediately followed by a State Trooper for approximately 1 mile…. State Trooper Kochka activated his emergency lights.").) Although we cannot attribute the traffic stop itself to the Octorara Defendants—as they are not in the employ of the Pennsylvania State Police—Plaintiff alleges that after his initial public comment on January 24, the Octorara Defendants alerted law enforcement of his expected presence at the

---

[32] The Octorara Defendants argue that Defendant Propper is an "employee" of the school district and therefore cannot be held responsible for the cancellation of the school board meeting, because under the Pennsylvania School Code, "only the school board has authority to set its meeting schedule." (Doc. No. 215-1 at 7–9 (citing 24 PA. CONS. STAT. 4-421).) They contend that "even if Plaintiff's theory that the meeting was 'canceled' because the Plaintiff wanted to speak is accepted as gospel, there is no allegation in the Complaint that ***Defendant Propper*** decided to cancel the meeting, had any role in canceling the meeting, or had any authority to cancel the meeting…. A principal is an employee of the board, not a member of it…. With respect to Defendant Propper, all the Plaintiff alleges is that he relayed the fact that the school board had cancelled its meeting. Simply relaying that fact in no way tends to suggest any plausible basis on which Defendant Propper could be held responsible for allegedly violating the Plaintiff's constitutional rights[.]" (*Id.* at 8–9 (emphasis in original).) The Court is not persuaded. As Principal of Octorara Junior-Senior High School, Defendant Propper is unquestionably in a position of authority over school matters. Even if he is not specifically authorized by Pennsylvania law to cancel school board meetings, the facts pleaded here plausibly give rise to the inference that he may have exerted some influence to have the meeting cancelled or otherwise taken part in its cancellation due to Plaintiff's expected attendance. In any event, Plaintiff clarifies that he "never made such a claim" regarding Defendant Propper's role in the cancellation of the meeting, and that he is actually "claiming that the encounter with [D]efendant Propper resulted in a call for service [to law enforcement]." (Doc. No. 251 at 10.)

next school board meeting scheduled for February 14, which in fact occurred when Plaintiff appeared only to learn the meeting had been cancelled.  (*See id.* at ¶¶ 120–21 ("Plaintiff arrived at the Octorara School on 2/14/2022 just before the regularly scheduled school board meeting. In advance of the meeting Plaintiff parked in public parking spot and noticed State Troopers in the parking lot as well.").)  The Court is satisfied that alerting law enforcement of a private citizen's intention to speak at a public meeting would "deter a person of ordinary firmness from exercising his constitutional rights."  *See Cole v. Encapera,* 758 F. App'x 252, 257 (3d Cir. 2018) ("However, evidence suggests that [Police Officers] Shultz and Childs engaged in retaliation following Cole's February 2013 complaints by stationing cars outside of the bar, following patrons who left the bar, taking photographs of customers as they waited in line, and using threatening or intimidating language to customers as they entered the bar."); *Muhammad ex rel. J.S. v. Abington Twp. Police Dep't*, 37 F. Supp. 3d 746, 760–61 (E.D. Pa. 2014) (finding that the institution of criminal justice proceedings, even juvenile delinquency proceedings, "clearly" qualifies as a retaliatory action for First Amendment purposes).

As to the third and final prong, causation, a retaliation claim "requires a causal link between a plaintiff's constitutionally protected activity and the retaliatory act."  *Mirabella*, 853 F.3d at 651.  One method of proving a causal link in the First Amendment context is to demonstrate "unusually suggestive temporal proximity."  *Id.* (citing *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)); *see also Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 759 (3d Cir. 2019) ("He can establish the requisite causal connection by showing either: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."). Plaintiff stated in his Complaint that he made a public comment criticizing the Octorara

Defendants at the January 24 school board meeting—only three weeks passed between that meeting and the events of February 14.  He also stated that following his appearance at the January 24 meeting, he sent "notices" to the Octorara Defendants regarding his intent to speak at future meetings.  "Unusually suggestive temporal proximity means within a few days but no longer than a month."  *Kostin v. Bucks Cmty. Coll. (Nursing Dep't)*, No. CV 21-850-KSM, 2022 WL 952729, at *11 (E.D. Pa. Mar. 30, 2022) (quoting *Eck v. Oley Valley Sch. Dist.*, 431 F. Supp. 3d 607, 623 (E.D. Pa. 2019)).  The Court finds that this timing is suggestive of retaliatory motive.  Moreover, Plaintiff alleges that the Octorara Defendants knew he would attend the meeting on February 14.  (*See* Doc. No. 1 at ¶¶ 126–28 ("This [cancellation] subsequently was revealed (through public records requests) in written communication that the meeting was canceled due to the Plaintiff wanted to speak at the board meeting.").)  The Court is satisfied that, accepting Plaintiff's allegations as true at the motion to dismiss stage, Plaintiff states a plausible claim for First Amendment retaliation as to his encounter with Pennsylvania State Police on February 14.

*Police Report*.  Plaintiff's second retaliation claim, however, fails at the first prong of the test.  Plaintiff alleges that Defendants Orner and Fox, specifically, retaliated against him for exercising his First Amendment rights at the March 21 meeting by falsely reporting to Pennsylvania State Police that Plaintiff had caused a disturbance.  But Plaintiff admits in the Complaint that such a disturbance did, in fact, occur at the school board meeting on that date.  As Plaintiff was leaving the meeting, he "publicly stated he was going to call the police and request the police to affect a private person arrest of the board members" and then requested that the troopers who were present at the meeting "place the board under citizen's arrest for deprivation of rights under color of law."  (*Id.* at ¶¶ 167, 169.)  The Court cannot accept that these facts

demonstrate that Plaintiff engaged in conduct or speech protected by First Amendment.  "The right of free speech does not encompass the right to cause disruption." *Startzell v. City of Phila.*, 533 F.3d 183, 198 (3d Cir. 2008).  Defendants Orner and Fox were within their right to remove Plaintiff—who was disrupting the orderly administration of the school board meeting by calling for the board's arrest—from the meeting and alert authorities.[33]  *See Barna*, 877 F.3d at 143 (permanent ban of disruptive speaker from school board meetings did not violate speaker's constitutional rights); *Galena*, 638 F.3d at 213 (ejection of a disruptive participant from a municipal meeting did not violate the plaintiff's constitutional rights); *Eichenlaub*, 385 F.3d at 281 (removal of a speaker from a township meeting to prevent "badgering, constant interruptions, and disregard for the rules of decorum" was constitutionally permissible).  In short, Plaintiff's claim that Defendants Orner and Fox "falsely" reported to Pennsylvania State Police that he caused a disturbance is unsupported by the allegations contained in his own Complaint.  For this reason, Plaintiff fails to state a claim upon which relief can be granted as to his police report retaliation claim.

\* \* \*

Upon our review of Plaintiff's First Amendment claims, the Court finds that Plaintiff has stated a claim for First Amendment retaliation as it pertains to the events that occurred when he attempted to attend the school board meeting on February 14.  Plaintiff's remaining First Amendment claims are dismissed without prejudice, with leave to amend if Plaintiff can cure the defects the Court has identified.

---

[33] Policy 903 permits the presiding officer to "request any individual to leave the meeting when that person does not observe reasonable decorum" and to "request the assistance of law enforcement officers to remove a disorderly person when the person's conduct interferes with the orderly progress of the meeting."  As explained above, Plaintiff does not bring a claim as to the facial validity or application of this provision, nor does he challenge his permanent ban from Octorara School District property.  *See supra* n.25.

### C.        Pennsylvania Sunshine Act (Count X)

As to Count X, Plaintiff alleges that the Octorara Defendants[34] "premeditatedly,

purposefully, prevented full public presentation, announcement, access, or visibility to public

record information regarding items discussed during public meetings in advance of public

meetings" in violation of the Pennsylvania Sunshine Act, 65 PA. CONS. STAT. §§ 701–16.  (Doc.

No. 1 at ¶ 406.)  Specifically, Plaintiff asserts that the Octorara Defendants "have established a

pattern and practice of producing incomplete meeting minutes" and "a pattern and practice of not

presenting to the public, information the public submits to the board with a clear, audible, and

written request to be documented, in its entirety, into the public record meeting minutes and

attachments."  (*Id.* at ¶¶ 407–08.)  He also accuses the Octorara Defendants of embellishing

public records by adding "opinion and narrative" that is "inconsistent with objective evidence,

research or data."  (*Id.* at ¶ 409.)  In response, the Octorara Defendants claim that there is "no

private remedy" against individual persons under the Sunshine Act, and to the extent Plaintiff

seeks to raise a cause of action under this statute, "[n]o such cause of action exists."  (Doc. No.

215-1 at 5–6.)  The Court agrees with the Octorara Defendants.

The Sunshine Act seeks to "provide citizens with an opportunity to observe the

deliberation, policy formulation and decision-making processes of public agencies."  *Kaleta v.*

*Clausi*, No. 4:12-CV-01987, 2013 WL 2300478, at *4 (M.D. Pa. May 24, 2013) (citing *Galena*,

638 F.3d at 199).  Specifically, the Act requires that: "(1) official action and deliberations by a

quorum of the members of an agency take place at a meeting open to the public; (2) the vote of

each member who actually votes on any ordinance must be publicly cast; (3) minutes must be

kept of agency meetings; and (4) public notice be given in advance of the meeting in a manner

---

[34] Plaintiff does not bring Count X against the Detective Defendants or Defendant Ryan.  (*See* Doc. No. 1
at 100–01.)

directed by the Act." *Id.* (cleaned up).  The Act also provides for a private right of action, whereby a declaratory or injunctive suit may be brought by "any person where the *agency* whose act is complained of is located or where the act complained of occurred."  65 PA. CONS. STAT. § 715 (emphasis added); *see also id.* § 714.1 ("If the court determines that an *agency* willfully or with wanton disregard violated a provision of this chapter, in whole or in part, the court shall award the prevailing party reasonable attorney fees and costs of litigation or an appropriate portion of the fees and costs." (emphasis added)).

It is clear from the language of the statute that any action brought under the Sunshine Act must be brought against an *agency*.  *See Gaus v. Pocono Mountain Reg'l Police Comm'n*, No. CV 3:17-1053, 2017 WL 5070227, at *7 (M.D. Pa. Nov. 3, 2017) ("Lastly, insofar as plaintiff asserts his claim under the Sunshine Act against defendants Moyer, Depiano, Courtright, Adams, Jablowski, Oser, Igdalsky, Ruiz-Smith, Kelly, Megliola, and Lamberton, *i.e.*, the Individual Commissioners, these defendants cannot be held liable under the Act because they are not agencies…. The Individual Commissioners do not fit the definition of a public agency under Pennsylvania law.").  The term "agency" is defined in the context of the Sunshine Act as, "any board, council, authority or commission of…any school authority, school board, school governing body, commission…."  65 PA. CONS. STAT. § 703.  This definition does not encompass individual members of those agencies.  Indeed, Pennsylvania courts have expressly found that "an individual member of a public body is not an 'agency' as defined by the Sunshine Act."  *Id.* (citing *Mazur v. Wash. Cnty Redevelopment Auth.*, 900 A.2d 1024, 1029 (Pa. Commw. 2006); *Ristau v. Casey*, 647 A.3d 642, 646 (Pa. Commw. 1994)).  As we have already explained, and as Plaintiff has stated repeatedly in his Complaint, he brings this suit against the Octorara Defendants in their *individual* capacities.  (*See* Doc. No. 1 at ¶¶ 19, 20, 50, 60, 101, 356.)  For

this reason, Count X fails as a matter of law, and because amendment would be futile, it is dismissed with prejudice.[35]

## D.    Equal Protection (Count II)

As to Count II, Plaintiff alleges that the Octorara Defendants violated his Fourteenth Amendment right to equal protection when they "singled out Plaintiff for unknown reason[s] on a discriminatory basis" and "launched spurious allegations, false narrative, fabricated motives, fabricated intentions, against the plaintiff, completely devoid of any objective evidence."  (Doc. No. 1 at ¶ 363.)  Plaintiff claims that after he voiced his criticism about the Octorara School Board at the January 24 meeting, the Octorara Defendants began a campaign of targeted attacks against him, and "aggressively censored, silenced, Plaintiff in a demeaning, authoritarian, pontificating, angry and emotionally manipulative manner that evinces a profound hostility to Plaintiff's well-established First Amendment rights."  (*Id.*)  He contends that the Octorara Defendants did not enforce the Octorara School Board policies equally; that is, they did not censor, remove, or call law enforcement on, other disruptive participants during board meetings.

---

[35] Plaintiff's claim under the Sunshine Act also appears to be untimely.  The Sunshine Act requires that "[a] legal challenge under this chapter shall be filed within 30 days from the date of a meeting which is open, or within 30 days from the discovery of any action that occurred at a meeting which was not open at which this chapter was violated, provided that, in the case of a meeting which was not open, no legal challenge may be commenced more than one year from the date of said meeting." 65 PA. CONS. STAT. § 713.  Plaintiff does not plead any facts to support the timeliness of this claim and fails to assert when the alleged violations occurred.  *See I-Lead Charter Sch.-Reading v. Reading Sch. Dist.*, No. CV 16-2844, 2017 WL 2653722, at *5 (E.D. Pa. June 20, 2017) ("Plaintiffs allege in their Amended Complaint that they discovered the Sunshine Act issues within thirty days of the commencement of this case, but provide no allegations or evidence to support that claim.  Plaintiffs' Amended Complaint does not include the dates of the occurrence of closed meetings alleged, and if dates of alleged closed meetings are provided in the Amended Complaint, they are more than one year before the complaint in this case was filed.").  It is also unclear whether this Court even has jurisdiction over Plaintiff's Sunshine Act claim.  *See Chester Cnty. Aviation Holdings, Inc. v. Chester Cnty. Aviation Auth.*, 967 F. Supp. 2d 1098, 1107 (E.D. Pa. 2013) ("To the extent that Plaintiff's procedural due process claim in Count II invokes the Pennsylvania Sunshine Act, the Act provides that "[t]he Commonwealth Court shall have original jurisdiction of actions involving State agencies and the courts of common pleas shall have original jurisdiction of actions involving other agencies.""); *see also* 65 PA. CONS. STAT. § 715.

(*Id.* at ¶ 365.)

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Jones*, 2021 WL 398494, at *8 (cleaned up).  "A plaintiff stating a claim under the Equal Protection Clause must allege [(1)] that he has been treated differently because of his membership in a suspect class or his exercise of a fundamental right, or [(2)] that he has been treated differently from similarly-situated others and that this differential treatment was not rationally related to a legitimate state interest." *Kostin*, 2022 WL 952729, at *12 (citing *Young v. New Sewickley Twp.*, 160 F. App'x 263, 266 (3d Cir. 2005)).  Here, Plaintiff appears to proceed under the second theory, which is most often applied "where a public official, with no conceivable basis for his action, penalizes a hapless private citizen." *Strain v. Borough of Sharpsburg*, No. CIV.A. 04-1581, 2006 WL 2087497, at *5 (W.D. Pa. June 28, 2006), *report and recommendation adopted*, No. CIVA 04-1581, 2006 WL 2089957 (W.D. Pa. July 25, 2006) (citing *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005)).  To state an equal protection claim on a "class of one" theory, "a plaintiff must allege that (1) the defendant treated him differently from other similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 243 (3d Cir. 2008).  In short, Plaintiff must demonstrate that he was "intentionally singled out for adverse treatment based on considerations that are wholly divorced from any legitimate government concern." *Giuliani v. Springfield Twp.*, 238 F. Supp. 3d 670, 705 (E.D. Pa. 2017), *aff'd*, 726 F. App'x 118 (3d Cir. 2018) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000)); *Eichenlaub*, 385 F.3d at 286 ("A plaintiff bringing a 'class of one' claim must demonstrate that any differential treatment

was "irrational and wholly arbitrary.").

The Court finds that Plaintiff has satisfied the elements for a "class of one" claim against the Octorara Defendants.  Specifically, Plaintiff alleges the following:

> The actions of the [school] board regarding the Plaintiff were clearly discriminatory and evidence will show that another private citizen, acted in a manner meeting the legal definition of a disturbance/disruption was ignored and no law enforcement called, and the incident was undocumented in the school minutes.  The other citizen is captured on video issuing verbal threats (terroristic in nature) to specific board members.  These disruptive outbursts by another citizen were during non-sanctioned public commenting period and violated the time, place, manner restrictions allegedly enforced by Octorara School Board. (Provide link to video) Defendants acted in concert to deprive Plaintiff[ ] of their [sic] right to equal protection of the law, as guaranteed by the Fourteenth Amendment.

(Doc. No. 1 at ¶ 365.)  In his response to the Octorara Defendants' motion to dismiss, Plaintiff reiterated that he has video evidence of an individual—who he claims is the wife of one of the Octorara Defendants—yelling at the board.  (*See* Doc. No. 251 at 16.)  He indicates that "[t]he behavior in this video had no reprimand from the board, no direction from the board, no call for service, no removal of the individual, no letter provided by the superintendent." (*Id.*)  He claims that because this disruptive individual was not removed, "Defendants appear to be discriminating the conduct of the plaintiff in contrast to accepting the behavior in this video as completely acceptable." (*Id.*)

These facts support a plausible equal protection claim under a "class of one" theory. Plaintiff has clearly alleged that he was treated differently than other disruptive board participants.  *See Phillips*, 515 F.3d at 244 ("[A]n allegation of an equal protection violation still must contain a claim that a plaintiff has been treated differently from others who are similarly situated."). *Contra. Pro. Dog Breeders Advisory Council, Inc. v. Wolff*, 752 F. Supp. 2d 575,

45

589 (E.D. Pa. 2010) ("Plaintiff Stoltzfus' class-of-one Equal Protection claim clearly fails to state a claim because she does not allege a specific instance of differential treatment."). As to the second element, Plaintiff alleges that the Octorara Defendants acted intentionally in executing that differential treatment. (*See* Doc. No. 1 at ¶¶ 364, 366 ("By enforcing these provisions against Plaintiff, Defendants, under color of law, deprived and continue to deprive Plaintiff…in violation of the First and Fourteenth Amendment…. Defendants acted willfully, deliberately, maliciously, or with reckless disregard for the Plaintiff's Fourteenth Amendment equal protection rights.").)

The final element is whether the Octorara Defendants had a rational basis for the differential treatment. Even if the Octorara Defendants possess a legitimate government interest in removing disruptive participants from school board meetings, the legitimacy of their decision to remove Plaintiff from the March 21 school board meeting cannot be resolved at this stage. *See Montanye v. Wissahickon Sch. Dist.*, 327 F. Supp. 2d 510, 520 (E.D. Pa. 2004) ("The rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard. The latter standard is procedural, and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail on an equal protection claim."); *Good v. Trish*, No. CIV.A. 1:06-CV-1736, 2007 WL 2702924, at *7 (M.D. Pa. Sept. 13, 2007) ("The Borough clearly possesses a legitimate government interest in enforcing its sidewalk ordinance, which is designed to protect the safety and welfare of the community by reducing the tripping hazards posed by uneven brick sidewalks. However, the question of whether Trish's decision to selectively enforce the sidewalk ordinance against Good bore a rational relationship to this legitimate government objective is better suited for summary judgment."). Plaintiff has alleged

that his removal from the March 21 school board meeting was "hostil[e]" and a result of his previous criticism of the Octorara Defendants.[36]  (Doc. No. 1 at ¶ 363.)  Considering these facts, the Court is satisfied that Plaintiff has pleaded there was no rational basis for the difference in treatment he received.  *See Montanye*, 327 F. Supp. 2d at 521 ("'Punishing and intimidating' special education teachers in order to reduce the special education services is not a legitimate government purpose.  Moreover, the kind of retaliatory actions plaintiff alleges occurred, 'marking down' her performance rating, blocking her union grievance, undermining her attempts to seek alternative employment, if proven, may establish irrational government action.").

For these reasons, Plaintiff has stated a plausible equal protection "class of one" claim against the Octorara Defendants.

### E.    Civil Rights Conspiracy (Count V)

Finally, we turn to Plaintiff's civil rights conspiracy claim.  Plaintiff's Complaint is riddled with allegations of conspiracy among the named parties; he alleges that the Octorara Defendants, in conjunction with the Detective Defendants and Defendant Ryan, "conspired to violate Plaintiff's First Amendment rights of free speech and petition by suppressing, under color of state law, written and oral public comments[.]"  (Doc. No. 1 at ¶ 385.)  Moreover, he claims that all defendants "participated in orchestrating a narrative" to not only censor, but criminalize, the exercise of his right to speak at the Octorara School Board meetings.  (*Id.*; *see also id.* at ¶ 112 ("Multiple Defendants attempted to collaborate, conspire and fabricate a narrative of converting constitutionally protected rights into criminal actions.").)  He also asserts that Defendants conspired to remove him from the March 21 school board meeting, resulting in

---

[36] Plaintiff's claim resembles a specific subset of the "class-of-one" theory: a "vindictive class-of-one" case.  *See Jeannot*, 356 F. Supp. 3d at 452 n.9 ("The Supreme Court considers an allegation of 'vindictive action,' 'illegitimate animus,' or 'ill will' an extra factor to 'class-of-one' theory cases where differential treatment is the result of 'uneven enforcement.'").

differential treatment of Plaintiff in violation of his Fourteenth Amendment right to equal protection.  (*Id.* at ¶¶ 363, 365, 387.)

To state a claim for civil conspiracy under Section 1983, "a plaintiff must establish (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy."[37]  *Gale v. Storti*, 608 F. Supp. 2d 629, 635 (E.D. Pa. 2009).  To prove the existence of a conspiracy, plaintiff must plead that there was "an agreement, understanding, or 'meeting of the minds' to violate the plaintiff's rights."  *Id.* (quoting *Startzell v. City of Phila.*, 533 F.3d 183, 205 (3d Cir. 2008)); *Mikhail v. Kahn*, 991 F. Supp. 2d 596, 645 (E.D. Pa. 2014), *aff'd*, 572 F. App'x 68 (3d Cir. 2014) ("A conspiracy is not parallel conduct by different parties; it must embody, at its heart, 'an agreement between the defendants and state officials[.]'").  At the motion to dismiss stage, a plaintiff "must assert facts from which a conspiratorial agreement can be inferred."  *Mikhail*, 991 F. Supp. 2d at 645 ("And the law is clear that the plaintiff must plead more than legal conclusions of a conspiracy or agreement.").  A civil rights conspiracy also requires "a predicate federal violation" to "anchor" the claim.  *Dondero v. Lower Milford Twp.*, 431 F. Supp. 3d 590, 606 (E.D. Pa. 2019), *aff'd*, 5 F.4th 355 (3d Cir. 2021); *see also Rink v. Ne. Educ. Intermediate Unit 19*, 717 F. App'x 126, 141 (3d Cir. 2017) ("There can be no civil conspiracy to commit an unlawful act under § 1983 where the plaintiff has not proven a deprivation of a constitutional or federal statutory right or privilege.").

Here, the Court has found that Plaintiff has stated claims for First Amendment retaliation

---

[37] Although a separate statutory cause of action for a civil rights conspiracy exists under 42 U.S.C. § 1985, a claim for a civil rights conspiracy may also be brought under 42 U.S.C. § 1983, as Plaintiff does here.  *See Berrios v. City of Phila.*, 96 F. Supp. 3d 523, 534 (E.D. Pa. 2015) ("A cause of action for conspiracy to violate constitutional rights exists under section 1983."); *Stengle v. Off. of Disp. Resol.*, 631 F. Supp. 2d 564, 578 (M.D. Pa. 2009) ("Plaintiff's conspiracy claim, as contained in Count III of the Second Amended Complaint, is based in 42 U.S.C. § 1983, not 42 U.S.C. § 1985.").

and a Fourteenth Amendment equal protection violation under Section 1983 against the Octorara

Defendants.  But Plaintiff's conspiracy claim against the Octorara Defendants in connection with

these violations is superfluous.  *See Hammonds v. Allegheny Cnty. Bureau of Corr.*, No. 18-CV-

1389, 2019 WL 3802064, at *9 (W.D. Pa. Aug. 13, 2019) ("Defendants cannot be held liable

under § 1983 for conspiring to violate Plaintiff's First Amendment rights unless they actually

violated his rights; but if they actually violated his rights, then the conspiracy charge adds

nothing to the case or to Plaintiff's potential recovery, as a § 1983 plaintiff may recover only

once for each injury.").  Accordingly, the conspiracy claim is dismissed as against them with

prejudice, as amendment would be futile.

Plaintiff also seeks to impute liability for these claims on the Detective Defendants and

Defendant Ryan, by claiming that they assisted in those violations as part of a broader

conspiracy.  *See Holt Cargo Sys., Inc. v. De. River Port Auth.*, 20 F. Supp. 2d 803, 843 (E.D. Pa.

1998), *aff'd*, 165 F.3d 242 (3d Cir. 1999) ("Provided that there is an underlying constitutional

deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose

liability on one defendant for the actions of another performed in the course of the conspiracy….

A conspiracy may be charged under section 1983 as the legal mechanism through which to

impose liability on all of the defendants without regard to who committed the particular act[.]");

*Hammonds*, 2019 WL 3802064, at *8 ("In other words, in a § 1983 case the function of

conspiracy doctrine is merely to yoke particular individuals to the specific torts charged in the

complaint.").

*First Amendment Retaliation Conspiracy.*  As to his First Amendment retaliation claim,

Plaintiff alleges that he contacted Defendant Ryan after the January 24 school board meeting to

communicate his concerns about the Octorara Defendants' conduct, and that those concerns were

re-directed to the Chester County Detectives Unit.  (Doc. No. 1 at ¶¶ 99–101.)  Specifically, "a series of communications took place with Detective O'Donnell, where Plaintiff provided sufficient context to the violations and potential continued deprivation of rights."  (*Id.* at ¶ 101.)  He claims that Defendant Ryan, in conjunction with the Detective Defendants, subsequently alerted the Octorara Defendants of his intent to speak at future meetings and implied that Plaintiff was a criminal threat to the school. (*Id.* at ¶ 109.)  In doing so, he asserts that the Detective Defendants and Defendant Ryan conspired with the Octorara Defendants to cancel the February 14 school board meeting in retaliation for his comments on January 24th, and that the criminal implication planted by Detective Defendants and Defendant Ryan was the Octorara Defendants' pretense for calling the Pennsylvania State Police on February 14.  (*Id.* at ¶ 127 ("Plaintiff had documentary evidence in advance of going to the school, that the school administrators, school board president in cooperation with local police and county detectives were conspiring to potentially criminalize the actions of the Plaintiff attempting to speak at the board."); *see also* Doc. No. 275 at 2–3 ("Under the direction of defendant Deb Ryan, the [Detective Defendants] opened an alleged 'criminal investigation' into a private citizen[.]").)  Moreover, Plaintiff contends that the parties' agreement to criminalize his conduct and cancel the meeting was memorialized in written communications between the Octorara Defendants, the Detective Defendants, and Defendant Ryan.  (Doc. No. 1 at ¶¶ 128–29 ("This subsequently was revealed (through public records requests) in written communication that the meeting was canceled due to the Plaintiff wanting to speak at the board meeting.  It is unknown if the decision to close the school was a suggestion by the Chester County Detectives, or by the Superintendent or the School Board.").)  Plaintiff claims that evidence of the parties' agreement can also be found in "recorded conversations of the Octorara School Board's YouTube Channel during

school board meetings[.]"  (*Id.* at ¶ 386.)

At this stage in the litigation and viewing these facts in the light most favorable to

Plaintiff, the Court is satisfied that these allegations support a claim for civil rights conspiracy

against the Octorara Defendants, Defendant O'Donnell, and Defendant Ryan.  *See Klein v.*

*Madison*, 374 F. Supp. 3d 389, 421 (E.D. Pa. 2019) (circumstantial evidence to support a civil

rights conspiracy "may include that the alleged conspirators did or said something to create an

understanding, the approximate time when the agreement was made, the specific parties to the

agreement, the period of the conspiracy, or the object of the conspiracy"); *see also Runco*

*Transp.*, 2015 WL 672260, at *10 (plaintiffs had sufficiently pleaded concerted actions taken by

public official defendants in First Amendment retaliation claim where they had claimed that

defendants had "plotted," "lobbied," and "threatened" in concert against them).  The Court is

also satisfied that these facts demonstrate Defendant O'Donnell and Defendant Ryan's "personal

involvement" in this alleged conspiracy, which is required to establish individual liability under

Section 1983.  *See Evancho*, 423 F.3d at 353 ("Personal involvement can be shown through

allegations of personal direction or of actual knowledge and acquiescence….The Third Circuit

has held that a civil rights complaint is adequate where it states the conduct, time, place, and

persons responsible." (internal citations omitted)).  But Plaintiff does not name the remaining

Detective Defendants in this scheme, let alone set out particularized factual allegations that

demonstrate they played an "affirmative part" in the alleged conspiracy.  *See id*.  For this reason,

Count V is dismissed as to Defendants Goggin, Sassa, and Dougherty.

*Fourteenth Amendment Equal Protection Conspiracy.*  Unlike his First Amendment

conspiracy claim, Plaintiff has not stated a claim for conspiracy as it relates to his Fourteenth

Amendment equal protection violation claim.  His allegations on this basis are entirely

conclusory.  (Doc. No. 1 at ¶ 383 ("The Defendants conspired to target Plaintiff's attempt to stand on constitutionally protected free rights, speech, and aggressively censored, silenced, Plaintiff in a demeaning, authoritarian, pontificating, angry and emotionally manipulative manner that evinces a profound hostility to Plaintiff's well-established First Amendment rights."); *see also id.* at ¶ 365 ("Plaintiff alleges that Brian Fox, Michelle Orner, Chester County Detectives conspired to remove plaintiff from public school board meeting.").)  He does not allege any "meeting of the minds" among the Octorara Defendants, the Detective Defendants, and Defendant Ryan, to treat Plaintiff differently than other disruptive participants when he was removed from the board meeting on March 21.  *See Berrios*, 96 F. Supp. 3d at 535 ("Plaintiff has not adduced evidence establishing that there was a single plan whose purpose everyone knew.").  Nor does he allege any specific actions taken by the Detective Defendants or Defendant Ryan in furtherance of that removal.  *See Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018) ("The plaintiff must provide some factual basis to support the existence of the elements of a conspiracy: agreement and *concerted action*." (emphasis added)).  Therefore, the Court finds that Plaintiff cannot sustain a conspiracy claim against the Detective Defendants or Defendant Ryan as to this deprivation.  Count V is dismissed against these parties without prejudice as to this claim only.  Plaintiff is granted leave to amend so that he may attempt to cure the defects identified herein.

### F.    Immunity Defenses

Having determined that Plaintiff has stated a First Amendment retaliation claim and Fourteenth Amendment equal protection claim against the Octorara Defendants, and a civil rights conspiracy claim against the Detective Defendants and Defendant Ryan for violating his First Amendment rights, the Court turns to the question of whether any Defendants have

available immunity defenses.

### 1.    *Qualified Immunity*

Defendant Orner[38] and the Detective Defendants assert a qualified immunity defense. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Mirabella*, 853 F.3d at 648.  A court may exercise its discretion in determining "which of the two prongs of the qualified immunity analysis to address first "in light of the circumstances in the particular case at hand." *Id.* at 649 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (cleaned up).

Defendant Orner claims that she is entitled to qualified immunity because she did not violate a clearly established constitutional right.  (*Id.* at 14.)  To the extent Plaintiff brings a claim against Defendant Orner "for being removed from a school board meeting," she argues that he cannot demonstrate that he had a right to be on school property.  She states: "Every Federal Court of Appeals that has considered whether an individual has a 'clear right' to access school grounds has concluded the answer is 'no.'" (*Id.*)  From the Third Circuit, Defendant Orner relies on *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist*, 877 F.3d 136 (3d Cir. 2017), in which the Third Circuit held that a citizen's right to participate in school board meetings, where the citizen had engaged in a pattern of threatening and disruptive behavior, was

---

[38] The Octorara Defendants assert a qualified immunity defense as to Defendant Orner, only.  (Doc. No. 215-1 at 11–15.)  They do not assert immunity defenses, at least at this stage, as to Defendant Fox or Defendant Propper.

not "clearly established." *Id.* at 144–45 ("[G]iven the state of the law at the time of the Board's ban there was, at best, disagreement in the Courts of Appeals as to the existence of a clearly established right to participate in school board meetings despite engaging in a pattern of threatening and disruptive behavior."). Thus, the individual school board members who had instituted a permanent ban on the plaintiff's attendance at school board meetings were entitled to qualified immunity. *See id.* Plaintiff argues that *Barna* is inapplicable. (*See* Doc. No. 251 at 15–16 ("The cases presented by counsel have no correlation to the actions, nor intentions of the Plaintiff and is both a Red Herring distraction to the court, and builds a Strawman that Plaintiff must refute….[*Barna*] was a case involving a parent issuing [a] threat and being disruptive. Plaintiff did not issue any threats and attempting to speak in public is not a threat[.]").)

Insofar as any of Plaintiff's surviving claims rested on his right to speak at the March 21 school board meeting, or his permanent ban from school property, *Barna* would have been instructive. But the disruption Plaintiff caused at the March 21 meeting had not yet occurred on January 24, when Plaintiff spoke out against the Octorara Defendants, including Defendant Orner; or on February 14, when he alleges that Defendant Orner and others allegedly retaliated against him for his previous comments by calling the police. *Barna* does not contemplate these facts. Nor does *Barna* address the question of whether government officials are entitled to qualified immunity when they have allegedly applied school board policies against one individual in a disparate, and possibly targeted, manner.

Similarly, the Detective Defendants fail to address their qualified immunity defense in the specific context of Plaintiff's First Amendment retaliation conspiracy claim. Although the Detective Defendants assert that they did not violate any "clearly established" right by communicating with other state and local agencies, they fail to address the retaliation aspect of

Plaintiff's allegations.  (Doc. No. 204 at 12 ("As to Plaintiff's complaint that the Detectives notified other law enforcement agencies and the Octorara School District of their concern over Plaintiff's behavior, there is no authority—none—that there is any constitutional requirement that law enforcement remain silent when confronted with conduct and information which they believe is worthy of communication.")).  *See also Reichle v. Howards*, 566 U.S. 658, 665, (2012) (clarifying that "the general right to be free from retaliation for one's speech" is not specific enough for a qualified immunity analysis).  Plaintiff acknowledges that although "detectives are not precluded from communicating information to other agencies," qualified immunity in these circumstances may be called into doubt if those communications are retaliatory, or otherwise "mischaracterizing, misrepresentation, and fabrication with the anticipated result of a law-abiding citizen['s rights] being violated."  (Doc. No. 275 at 7.)

The Court emphasizes that at the motion to dismiss stage, "the defendant has the burden of pleading and proving qualified immunity."  *Mitros v. Cooke*, 170 F. Supp. 2d 504, 507 (E.D. Pa. 2001) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)); *see also Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010) ("The burden of establishing entitlement to qualified immunity is on [the defendant].").  In asserting this defense, Defendant Orner and the Detective Defendants fail to grapple with the facts and claims alleged in Plaintiff's Complaint.  *See Jennings v. Borst*, No. 5:18-CV-05624-JDW, 2019 WL 4447593, at *3 (E.D. Pa. Sept. 16, 2019) ("They do not highlight particular claims against them and analyze the pleadings nor do they conduct any of the other analysis necessary to establish qualified immunity.  Instead, they just use the phrase 'qualified immunity' and cross their fingers in the hopes that the Court will dismiss the claims against them.").  Indeed, "'qualified immunity' is not a talismanic phrase that relieves Defendants of their burden to show that their actions did not violate Plaintiff's clearly established

constitutional rights." *Id.* at *4 ("Moreover, the Court disagrees with Defendants' characterization of the Complaint, which contains numerous allegations that, if proven, could amount to violations of Plaintiffs' constitutional rights.").  For these reasons, the Court will not grant qualified immunity to Defendant Orner and the Detective Defendants at this stage.  This defense is dismissed without prejudice; they are free to raise this argument again.

### 2. *Absolute Immunity*

Defendant Ryan also asserts an immunity defense, but believes she is entitled to absolute immunity, rather than qualified immunity, because she was acting in the scope of her role as a prosecutor in the events underlying Plaintiff's lawsuit.  (*See* Doc. No. 177 at 14 ("Prosecutors are entitled to absolute immunity in civil suits that challenge their decisions concerning criminal matters.  This immunity covers quasi-judicial functions, such as actions taken in the courtroom, as well as decisions regarding obtaining, reviewing and evaluating evidence.").)

The invocation of absolute immunity in the prosecutorial context is a "fact-specific analysis," which requires a functional examination of the prosecutor's conduct.  *See Fogle v. Sokol*, 957 F.3d 148, 159–60 (3d Cir. 2020) ("While the Supreme Court has extended the defense of absolute immunity to certain prosecutorial functions, it has not blanketed the actions of a prosecutor merely because they are performed by a prosecutor.  Instead, courts must focus upon the functional nature of the activities rather than the prosecutor's status to determine whether absolute immunity is warranted." (cleaned up).)  This functional test entitles a prosecutor to absolute immunity "*only* for work intimately associated with the judicial phase of the criminal process." *Id.* (quoting *Burns v. Reed*, 500 U.S. 478, 486–87 (1991)) (emphasis added).  "By contrast, a prosecutor's investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity."

*Id.* at 160 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). "Once asserted, the onus is on the prosecutor to demonstrate that absolute immunity should attach to *each act* he allegedly committed that gave rise to a cause of action," a burden that is "uniquely heavy." *Id.* (emphasis added). The Third Circuit has explained that asserting an absolute immunity defense "via a Rule 12(b)(6) motion subjects the defendant to a more challenging standard of review" because "a defendant must show that the conduct triggering absolute immunity 'clearly appears on the face of the complaint.'" *Id.* at 160–61 (quoting *Wilson v. Rackmill*, 878 F.2d 772, 776 (3d Cir. 1989)).

We cannot accept that Defendant Ryan has met her burden at this stage in the litigation. Defendant Ryan does not identify the particular conduct alleged against her,[39] let alone explain how that conduct falls within the ambit of her role as an advocate, such that it would entitle her to a complete shield from Plaintiff's First Amendment retaliation conspiracy claim. *See Fogle*, 957 F.3d at 161 ("Thus, while we tend to discuss prosecutorial immunity based on alleged *acts*, our ultimate analysis is whether a defendant has established absolute prosecutorial immunity from a given *claim*." (emphasis added)). Moreover, Plaintiff has alleged facts that suggest Defendant Ryan was acting in no more than an investigatory role when she communicated with the Detective Defendants and the Octorara Defendants following Plaintiff's attendance of the January 24 board meeting and future meetings. She has not explained how this conduct was more than investigatory in nature. *See Buckley*, 509 U.S. at 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone

---

[39] Defendant Ryan claims that, as best she can discern, "Plaintiff is seeking to compel [her] to bring criminal charges against various school district officials for enforcement of a School Board policy[.]" (Doc. No. 177 at 11.) To be sure, the Complaint mentions that Plaintiff asked the District Attorney to convene a grand jury to investigate the Octorara Defendants; but, as explained above, *see supra*, those facts are not the basis for his conspiracy claim against her.

arrested."); *see also Price v. Steinmetz*, No. CV 19-3225, 2020 WL 5039447, at *8 (E.D. Pa. Aug. 25, 2020) (prosecutor engaged in investigative conduct not entitled to absolute immunity where he advised police regarding a confidential informant and directed police to make an arrest).  For now, the Court denies Defendant Ryan's request for absolute immunity. This denial is without prejudice, and Defendant Ryan is free to raise this immunity defense again.

## IV.    CONCLUSION

For these reasons, Defendants' motions are granted in part and denied in part.

Plaintiff's First Amendment retaliation claim in Count I and Plaintiff's equal protection claim in Count II remain against Defendants Orner, Propper, and Fox.  Count V remains against Defendant O'Donnell and Defendant Ryan.

Counts II, IV, VI, and VII, and any claims in Count I aside from Plaintiff's First Amendment retaliation claim, are dismissed without prejudice against Defendants Orner, Propper, and Fox.  Counts I, II, III, IV, VI, VII are dismissed without prejudice against Defendants Bowman, Ganow, Hurley, Koennecker, Norris, Zimmerman, Yelovich, Hardy, Curtis, Goggin, O'Donnell, Sassa, Dougherty, and Ryan.  Count V is dismissed against Defendants Bowman, Ganow, Hurley, Koennecker, Norris, Zimmerman, Yelovich, Hardy, Curtis, Goggin, Sassa, and Dougherty without prejudice.

Counts VIII and IX are dismissed against Defendants Bowman, Fox, Ganow, Hurley, Koennecker, Norris, Zimmerman, Yelovich, Propper, Orner, Hardy, Curtis, Goggin, O'Donnell, Sassa, Dougherty, and Ryan with prejudice.  Count X is dismissed against Defendants Bowman, Fox, Ganow, Hurley, Koennecker, Norris, Zimmerman, Yelovich, Propper, Orner, Hardy and Curtis with prejudice.  And Count V is dismissed against Defendants Orner, Propper, and Fox with prejudice.  An appropriate Order follows.